## Case No. 3,562.

DANIEL v. MITCHELL et al.

[1 Story, 172;[1] 3 Law Rep. 412.]

Circuit Court, D. Maine. May Term, 1840.

EQUITY—ANSWER AS EVIDENCE — RESCISSION OF CONTRACT—MISTAKE—LIABILITY OF AGENT.

1. The rule in equity is, that an answer, responsive to the allegations and charges made in the bill, and containing clear and positive denials thereof, must prevail, unless it is overcome by the testimony of two witnesses, or by one witness and other attendant circumstances, supplying the want of another witness.

[Cited in Towne v. Smith, Case No. 14,115; Carpenter v. Providence Washington Ins. Co., 4 How. (45 U. S.) 218; Clark v. Hackett. Case No. 2,823; Delano v. Winsor, Id. 3,754; Scammon v. Cole, Id. 12,432; Godden v. Kimmell, 99 U. S. 206; Ivinson v. Hutton, 98 U. S. 82.]

2. A bargain, founded upon material misrepresentations of matters of fact, even though they were inadvertently made through the mutual mistake of the parties, or by the mistake of the grantors alone, will be annulled in equity.

[Cited in Smith v. Richards, 13 Pet. (38 U. S.) 36; Doggett v. Emerson, Case No. 3,960; Warner v. Daniels, Id. 17,181; Yates v. Little, Id. 18,128.]

3. In equity, mistake as well as fraud, in any representation of a fact, material to the contract, furnishes a sufficient ground to set it aside, and to declare it a nullity.

[Cited in Warner v. Daniels, Case No. 17,181; Mason v. Crosby, Id. 9,234; Delano v. Winsor, Id. 3,754.]

4. A contract was made by certain parties, wherein it was agreed, that one party should sell and the other should purchase a certain tract of timber-land in the state of Maine, and if, upon an exploration, it did not contain sixty millions of pine timber, and there was not a stream running through it, which would, with an ordinary freshet, carry logs from the tract to the Kennebec river, without difficulty, the agreement should be void. The parties procured an exploration, and upon a favorable report of their agent, purchased the tract, taking a deed of the same, and making the stipulated payments. It subsequently appeared, that there

was a gross mistake in the estimation of the quantity of timber, that the exploration was not made entirely upon the tract in question, but partly upon an adjacent one, and that the pine timber did not, in fact, exceed five millions. Under these circumstances, a bill in equity was brought by one of the purchasers to rescind the contract, and praying for general relief. *Held*, (1.) That the original contract must be set aside as founded in gross mistake. (2.) That the conveyance to the plaintiff must be rescinded, and the purchase money restored. (3.) That the agent of the owners, who had effected the sale in his own name, having received the purchase money, was primarily liable to repay it; and in his aid, such of the other defendants for whom he acted as agent, and such as had received any part thereof, with a full knowledge of all the circumstances, must repay the proportions thereof respectively received by them.

[Cited in Warner v. Daniels, Case No. 17,181; Doggett v. Emerson, Id. 3,962; Ferson v. Sanger, Id. 4,752; Mason v. Crosby, Id. 9,234; Smith v. Babcock, Id. 13,006.]

5. An agreement having been made between the defendants, by which they mutually agreed, upon the division of the notes, taken for the purchase money, among them according to their respective interests, that they would bear their respective proportions of any losses, which might arise from any inability of the purchasers to pay the same; it was *held*, that the plaintiff could not, in equity, have any benefit from this agreement, so as to avail himself of it in case he was not able, from the parties directly liable to him, to obtain back the purchase money decreed to him.

Bill in equity [by Otis Daniel against William C. Mitchell and others] to rescind a contract for the purchase and sale of timber-lands in the state of Maine, to set aside the conveyance thereof, to recover back the consideration paid in money, and to have the notes given for the balance delivered up. The bill set forth, that William C. Mitchell, Tristram G. Mitchell, David Wescott, William Wescott, Erastus Hayes, Israel Waterhouse, Thomas Warren, and William B. Gooch, claimed to be the owners of certain undivided portions of a tract of land in the state of Maine, called the Ford tract, situated upon the upper Austin stream, being a part of the Bingham Kennebec purchase, in the county of Somerset; that they employed James Todd·as their agent, to contract for the sale of the tract, and gave him a bond by which he was authorized to dispose of it as he should see fit, and delivered to him certain certificates of the quantity of timber thereon, &c.; and that Todd employed one Thomas W. Haskins to aid him in effecting a sale, representing and authorizing him to represent, that the tract contained pine timber sufficient to make sixty millions feet of boards, and that there was a suitable stream for floating and getting the logs out into the Kennebec. That upon such representations and assurances, the plaintiff, in connexion with other persons, was induced to purchase three undivided sixteenth parts of the tract, and subsequently seven sixteenths more, making in the whole, ten sixteenth parts of said tract, at the price of four dollars per acre; for which he paid one fourth part in cash, and gave his notes, secured by mort-

---

[1] [Reported by William W. Story, Esq.]

gage, for the other three fourths, payable in one, two, and three years. The money was paid to Todd, and the notes taken by him, on his own account, so far as he was concerned, and as agent, and for the benefit of the other defendants, who received and appropriated the cash and notes to their own use, according to agreement among themselves. The bill complained, that practices and artifices had been used to produce an erroneous and exaggerated estimate of the quantity of pine timber upon the land, and of the facilities for floating it, and getting it out by water; and alleged, that in an exploration of the tract, which was made previous to completing the contract, in which Haskins was employed as an agent for the plaintiff, and the other proposed purchasers, he and others with him, on the part of the purchasers, were so guided and deceived, as to be carried through the same births or glades of pine timber several times, as though they were distinct and different, and thus great quantities of good pine timber were exhibited to them as standing on that tract, when they were in fact standing on adjacent lands; and further, that the tract did not contain nearly so much pine timber as was represented, nor in fact more than enough to make five millions feet of boards; that it was worth very much less than it was represented; and that the plaintiff had requested the defendants to rescind the purchase, and restore the money, and give up the notes; but they had refused to comply. The bill called upon the defendants to set forth their respective interests in the tract at the time of the sale; and what portion of the consideration each received; and how the distribution was made among them; and prayed, that the contract might be rescinded and annulled, the money might be repaid, and the notes discharged and cancelled, or compensation made, and the plaintiff indemnified. It also prayed for general relief. William Wescott died without putting in an answer, and the suit was discontinued in regard to him. David Wescott and Israel Waterhouse died after making answers, and the bill was revived against their representatives.

The answer of Todd recited a verbal agreement, made between him and another person, to join in obtaining a bond for the sale of some good timber tract, for the purpose of disposing of it again at a profit; and that upon hearing of the Ford tract as one of that description, in which several persons were interested, they applied to the Wescotts for information respecting it; that learning it was estimated to contain from fifty to seventy millions feet of pine timber, and that there were undoubted certificates of its containing from fifty to sixty millions, they first took a bond from the Wescotts, for the conveyance of six thousand acres, at four dollars an acre; the Wescotts having obtained the consent of some of the owners, provided efforts were made to sell without loss of time; that the

bond was dated about the last of May, 1835, and was to run ten days; that failing to make a sale, this bond expired; that finding the Wescotts had the disposal of about ten thousand or twelve thousand acres of the tract, a new bond was procured from them June 9th, 1835, for the conveyance thereof, in common and undivided, on the payment of four dollars an acre in thirty days, one quarter in cash, and the rest in notes at one, two, and three years; and that, upon performance of the new agreement, the Wescotts were to cause a deed of the title derived from Massachusetts, to be made by Mason Greenwood. At the same time it was agreed, that the holders of the bond should go to Boston immediately, and endeavour to effect a sale; and if they did not succeed in getting up a company in ten days, who should undertake to explore it with a view to purchase, the bond should be given up. That Todd having delayed to proceed to Boston, and the Mitchells having objected to his going on with the business any further; and William Wescott having, on the 15th of June, disposed of his interest in the ten sixteenths mentioned in the bond, to the Mitchells, it was at length arranged, that one week from that time should be allowed to afford an opportunity to get up such a company; provided, that, if said Todd should succeed in so making a sale, they, who were interested in the tract should also have one half of what it should sell for, per acre, over the four dollars, the price fixed in the bond. That about the same time, the Wescotts put into the hands of Todd and his partner, sundry letters and certificates, containing the opinions and the signers thereto, in regard to the character of the tract as timber land, and of the streams, which ran through it, and the quantity of timber upon it. That the defendants never authorized Todd to exhibit the certificates and letters as certainly true and correct, but only that they fully believed them to be so; that when he went to Boston, which he did accordingly within the week, he placed these papers in the hands of Haskins, to be exhibited by him to whomsoever he pleased; and that he (Todd) himself believed, and so stated to Haskins, that the statements were in his opinion correct and conformable to fact; but that he did not authorize Haskins to represent, that they were absolutely free from error or mistake, nor to undertake to guaranty to that effect, because he was not authorized to do so, and had made up his mind not to do so; the intention being, that whoever should purchase, should not do so merely on the faith of those certificates, but should take their own steps to satisfy themselves of the truth of the statements. That he, Todd, employed Haskins to assist him in hunting up purchasers and getting up a company for the purpose; for which Haskins was to receive a certain compensation, as was known to the plaintiff. He denies, that he gave Haskins power to make any absolute

assurances; but he admits, that he believed there were at least sixty millions of pine timber on the tract, besides other timber, and that the streams running through it were sufficient, with an ordinary freshet, to float the timber, when cut into logs, into the Kennebec river; and that Haskins was authorized to represent, that, in the opinion of those interested in the sale, there was that or a greater amount of timber, and that such was the nature of the streams. But that this was a matter of opinion merely, on their own part, of the correctness of which the purchasers must inform and satisfy themselves. That Haskins did interest himself accordingly, in finding purchasers, and getting up a company, consisting of the plaintiff and others, who, on the 18th of June, 1835, entered into articles of agreement for the purchase; and that, previous to that time, he, Todd, conversed with the complainant, and repeated to him substantially what he had said to Haskins, concerning the tract, and the certificates, &c. concerning it. He, Todd, admits, that he stated to Haskins, and also to the plaintiff, that he had but a week to make up his company; that the time limited would then expire; and that the owners then would not sell at so low a rate as four dollars and a half per acre as they all believed, that timber lands were rising; that he himself had not, and did not profess to have, any personal or practical knowledge of the tract, or of the subject, but merely expressed his own actual and honest opinion, founded on, and referring to, the sources, whence it was derived, leaving it entirely for the intended purchasers to ascertain the actual truth of facts in regard to the premises, which they were to take upon themselves; for which purpose, they were to take such means, and appoint such persons to go and examine as they should think proper, he stipulating to pay the expense of one person, at any rate, and also of another to be sent by the purchasers, in case the result should not turn out as represented. That the purchasers accordingly selected Haskins as their agent for this purpose, and that he, Todd, taking up William Wescott by the way, accompanied him to the Ford tract, to show it to them, being informed, as he also informed Haskins, that William Wescott had sold out his interest in the ten sixteenths, although he retained an interest in another undivided portion of the same tract; that William Wescott recommended one Luther Moore as a person accustomed to traversing the woods, and well acquainted with the tract, and that he, Todd, employed him as a guide in making the exploration, and for nothing else, as he was only a hunter, and not a getter of timber. That Haskins also employed one Thomas Chase to assist in exploring and making the estimate, for which he, Todd, believed him to be perfectly competent; and they were also accompanied by Mollineaux, one of the company of purchasers; that every thing in

relation to the business of the exploration was conducted fairly, and without any wish or attempt to mislead, deceive, or influence Haskins, or any other person engaged in forming an estimate, or in making their report; that they arrived on the ground on the evening of the 22d of June, and having spent two days in the exploration. and Chase having made the quantity of timber on the tract to be seventy millions, and Haskins and Mollineaux declaring their satisfaction therewith, Haskins informed him, Todd, on the 24th of June, that he, as agent, concluded to complete the purchase, as he was authorized to do, and that he should explore the tract no further; that on the 25th they all left the tract on their return; that at the request of Haskins, on the next day, the certificates were signed at Bingham, by Wescott, Moore, and himself, stating the result of the exploration, which he, Todd, signed, after making some objections to them, both as being mere matters of opinion, based upon the opinions of others, and, also, as being too general in its terms. But, he says, that in company with Haskins, he did see on the tract much pine timber of a large size, and apparently of the first quality; and so far as he could judge, he did believe, that the tract contained the full quantity of pine timber which had been represented; and that every one of them did believe, that there was more than seventy millions of pine timber upon the tract, and that the streams were such as set forth in the certificate of Chase; that Wescott and Moore went with Haskins, Mollineaux, and Chase to visit the Austin stream, and that Haskins sent Chase and Moore to visit parts of the Ford tract not explored by Haskins, and they reported to him; and that William Wescott stated to Haskins, that there was a glade of pine timber on the northwest side of it, and that he was not acquainted with a certain other part of it, called the L part. That having been so informed, the parties, who employed Haskins, concluded to take the land and make the purchase, and that a deed of warranty was procured from Mason Greenwood, according to the bond, and accepted by the parties, as a full compliance with whatever was to be done on his part. That the plaintiff and the other parties to the purchase thereupon paid him $12,500, being one quarter of the price, and gave their several promissory notes for the remainder, according to the terms of agreement, amounting to $37,500. of which he, Todd, paid over to the other defendants $11,250 in money, and delivered to them all the notes, which were divided and distributed among them in their several proportions, retaining $1250, and taking back from some of the defendants their several notes, and from others two of the notes of one of the purchasers, in full of the share of the purchase money, belonging to himself and his partner, amounting to $3750.

David Wescott's answer stated, that he had originally purchased part of the Ford tract

with William Wescott, his brother, who had employed one Jonas Brown to explore and estimate the timber, accompanied by Luther Moore, a hunter, who had traversed the tract. That Brown said, that there was nearer eighty millions than fifty; and that Brown, Moore, and William Wescott made a certificate of there being fifty millions. That he first agreed to take three thousand acres at one dollar and sixty-seven cents per acre, and afterwards agreed with William to take three thousand more, at an increased price of over forty cents per acre. That the certificate was delivered by William Wescott, deceased, to Todd and his associate, at their request; but that no farther use was to be made of it, than to invite purchasers to look and examine. No representations whatever were authorized, but the defendants offered to pay the expenses of any person sent to explore, if there did not prove to be fifty millions. Wescott's answer denied any knowledge, or belief, that any means were made use of to mislead or deceive the agent sent by the proposed purchasers, or that any artifices were practised to influence the result of the exploration, or to raise the estimate of the quantity of timber upon the tract, or that the plaintiff was induced to purchase upon the report of the agent. It averred, that they all believed, that the tract contained good pine timber enough to make sixty millions feet of boards, and that they were not apprized of any grounds for concluding that it only contained a less quantity.

The joint answer of the Mitchells, stated their own original purchase of four thousand acres of the tract, and that William C. Mitchell purchased one thousand acres separately; that one of the Wescotts applied to them for leave to include a portion of their interest in a bond to be made to Todd and another, setting forth that circumstance in a manner similar to the statement in the answer of David Wescott. That they had letters and certificate of one Hill in relation to the timber on the tract, which were put into the hands of Todd; and that William Wescott delivered to Todd the certificate of the exploration made with Brown and Moore. That none of the defendants meant to authorize Todd to guaranty the statements in letters or certificate as free from error of judgment, or as being founded on certain and correct information as to the quantity of timber; but that they were only intended to recommend the tract, as an object of attention, to any persons who should wish to purchase, and to induce such persons to inquire and satisfy themselves; and they advised Todd to make it the condition, that they should do so. They denied knowledge of any particulars in regard to the explorations or proceedings attributed to Todd and William Wescott, or of the original certificates, and they disbelieved that any such artifices were practised, as supposed; that they did believe, that the proceedings were conducted in perfect good faith, and without any fraudulent intent; and they denied, that they represented Brown, William Wescott, and Hill, to be men of character and acquainted with timber; but stated, that William Wescott was a man of integrity, and Brown was a judge of timber; that all the signers of the certificates were disinterested persons, without any inducement to make an exaggerated report; and that William Wescott actually rated the quantity less than he believed there was on the tract. That they themselves did verily believe, that the Ford tract contained more than sufficient to make sixty millions feet of boards, and never had any reason to suppose it contained less, nor heard of any lower estimate, excepting the certificate of Brown; and that all the defendants believed that the tract contained sixty millions.

The answers of the other defendants set forth their several relations to the transaction, and the manner in which they became possessed of, or concerned in, their respective proportions of the tract. They denied authorizing, or that they knew of the delivery of certificates, or authorized Todd to make any representations concerning the quantity of the timber, the character of the stream, or the facilities of conveyance; they averred that the defendants generally thought it to be a well timbered tract, and believed, that it contained not less than from fifty to sixty millions of pine timber; and one of them added, that the streams were sufficient, with an ordinary freshet, to float it into the Kennebec. They denied any knowledge or participation in any fraudulent or improper practices in regard to the procurement or use of the certificates, or any belief, that any such were used to falsify or affect the exploration, or effect a sale. They averred, that the object was to enable Haskins to satisfy himself, by means of the exploration, in such a manner, and to such an extent, as he should think for the interest of his employers. They avouched for the general good character and respectability of the signers of the certificates and explorers, and expressed the belief, that all the proceedings in respect to the exploration were conducted with perfect fairness and good faith. An agreement was entered into on the 22d of July, 1835, between the Wescotts, Mitchell, Warren, Waterhouse, Hayes, and Gooch, who were jointly concerned in the sale of the ten sixteenths, which recited the conveyance to the plaintiff and others, and the receiving of the notes of the purchasers in payment of their respective shares, secured by mortgage, and set forth the proportions, in which the parties to this agreement were interested in the land, of which the fee was in said Greenwood, and in which they had consequently become the holders of the notes, and interested or accountable as such. By this agreement they stipulated with each other, that in case any of the promissors should become insolvent, before the notes should become payable, so

that any loss should arise, or in case of any loss on the same, arising from any cause other than the negligence of the holders, such loss should be borne by all the parties, in the proportion of their respective interests; and the holder of any note who should experience any such loss, should, after notice and request, have his right of a remedy for contribution against any other of said parties refusing to pay his proportion of such loss, either by action of assumpsit, or on the agreement.

The certificates referred to, were in the following terms:

"Bingham, May 13, 1833. We, the subscribers, do hereby certify that we have this day returned of exploring the Ford tract, and our estimation is, that there is fifty millions, to speak within bounds, of prime pine timber, that is to say, as good as any on the Kennebec waters; and we have also examined the Austin stream, and find sufficient to run the above timber in the main Kennebec river. Jonas Brown, Luther Moore, William Wescott."

"This is to certify, that from the knowledge I have of the Ford tract, it is unquestionably one of the best timber tracts upon the Kennebec waters. And I would also state, that I have just sold my interest in the Saco tract, being on part of the same stream, at seven dollars and fifty cents per acre. John Hill."

"Bingham, June 23, 1835. I, the subscriber, hereby certify, that I have this day returned from an exploration of the Ford tract, and having been also frequently over the tract in hunting, I am fully satisfied, that the estimation made by Jonas Brown, William Wescott, and myself, in May, 1833, will fall short of the quantity of timber; and that the one made this date by Mr. Thomas Chase, is within bounds. The reason they fell short was, that they did not explore at that time the part called the L, which we have done this time, and find more timber on it than was anticipated. And I also certify, that I have been well acquainted with the stream called the Austin stream, for these twenty years past, and consider it good and sufficient to run logs to the main Kennebec river; and the north and south branches of it on the tract sufficient to run them into the main Austin stream with a common freshet after building one, and repairing two, dams on the said streams, or even without a freshet. Luther Moore."

"I hereby certify, that I agree to the above, and consider it perfectly true. William Wescott."

"Bingham, June 26, 1835. I, the subscriber, do hereby certify, that I have this day returned from exploring the Ford tract, in company with R. W. Mollineaux and Thomas Haskins of Boston, Massachusetts, and my estimation is, that the Ford tract, it is unquestionably one of the best timber there is not less than four and a half thousands to the acre, on an average, of prime pine timber, as good as any on the Kennebec waters, and one and a half thousands of good spruce timber, worth as much as pine, also to the acre,—and have also explored the stream called the Austin stream, which runs through the tract, and do certify, that I consider it a good and sufficient stream to run logs to the main Kennebec river. Thomas Chase."

"I hereby certify, that I was also with Mr. Thomas Chase, in exploring the Ford tract, and was fully satisfied, that the estimation is within bounds, and the quality of the timber is the first, and the stream is as represented, and that it may be made, with very little expense, so as to run logs even without a freshet. James Todd."

It appeared from the proof, that the land was purchased as a timber tract, and principally with reference to the quantity of timber upon the tract, and that the purchasers relied upon the representation made to them in that respect. In pursuance of the agreement, Haskins and Mollineaux, one of the purchasers, were carried on to the land by Todd, accompanied by William Wescott, and taking Moore and Chase with them as guides, to explore it. They were employed two or three days, exploring different parts together; but having become fatigued, and their provisions having given out, they concluded to finish the business, and leave Chase and Moore upon the land to report the result, to which they had then arrived, as exhibited in the certificates, and with which Haskins was, at the time, understood to be satisfied. From a subsequent survey of the tract, pursuing the route of the recent exploration, it appeared, that in the course of that exploration, Haskins and others had, by some means, been led off from it, and that timber had been shown, as being upon land, that was not included in the tract, but which lay adjacent to it; and that there was a considerable quantity of timber upon the contiguous tract, and upon different borders of the Ford tract. Certain persons were afterwards sent to examine the tract; and the defendant being previously requested to join them, who estimated, that at the time of the sale, in 1835, the quantity of timber, suitable to be sawed into boards, did not exceed three and a half millions feet. Some of the witnesses, who examined it afterwards, with a view of making a more accurate estimate, made it less. But from the testimony of Samuel Homans, who, some time after the purchase, was employed in driving the logs cut off the Ford tract, out of the Austin stream, it might be inferred, that the tract contained fully that quantity. And from the testimony of Samuel Chamberlain, that there might have been more, but not much. There was evidence, also, that there were some spruce and cedar upon the Ford tract. Jonas Brown, one of the signers of the original certificate of May, 1833, who was examined for the defendants, testified, that the usual course of explorers was to go to a high ridge

or elevation on the tract, to take a compass and mount with it to the top of a tree, where the timber could be seen to a considerable distance, there to set their compass, and take the bearings of the several glades of timber in sight; then to go to the glades, and make a general estimate, according to their best judgment, as to the quantity and quality of the timber, without actually counting, scaling, or measuring. He thought it would have taken six months to make an exact estimate of the quantity of timber in this tract at the time when he explored it in 1833. He was the agent for the Wescotts in lumbering on it in the winter of 1833–4, and cut two millions four hundred thousand feet. He did not remember giving any certificate of the quantity of timber on the Ford tract, when he explored it with Wescott in 1833; but, if he did give a certificate, that there were "fifty millions of good pine timber," the words, "and spruce," were, or ought to have been, inserted after the word "pine." He believed, that more than half of that quantity of timber was pine. He did not estimate the pine separately from the spruce, and in his opinion, there was about an equal quantity of each upon the tract. None of the witnesses examined for the defendants undertook to make any precise estimate of the actual quantity of pine timber upon the tract at the time of purchase. Thomas Chase, who was one of the explorers, and signed one of the certificates, June 26th, 1835, testified, that according to his best recollection, he estimated the whole at four and a half thousand feet to the acre, including pine and spruce.

A cross bill was filed by the defendants in the original suit, upon the alleged ground, that during the pendency of that suit a compromise and adjustment of it had taken place, by virtue of which, the original defendants (now plaintiffs) had agreed to receive, and had accepted fifty per cent. upon the notes given for the balance of the price of the land, in addition to the first payment of money, and had thereby been discharged from any further claim or prosecution of the former suit. The cross bill charged, that all the original purchasers of the ten sixteenths had a common interest and concern, which induced them to unite together as in one cause, and they had authorized the original plaintiff (Daniel) to compound and settle the whole matter. That it was mutually agreed between the parties to the suit, that the notes given for the balance of the consideration of the land, should be given up on payment, or securing the payment of fifty per cent., and that the suit should thereupon be finally compromised and settled. And it was particularly alleged, that, during the course of negotiation to this end, Daniel assigned and urged as a reason for not consenting to pay any larger amount upon the notes, that he himself and the other parties concerned in the purchase, had

been put to much trouble, and had incurred great expense in prosecuting their bill, which they should lose by adjusting and taking up the notes. The bill thereupon prayed for an injunction against Daniel, and a dismissal of his suit. The answer of Daniel contained a positive denial of the principal allegations of the cross bill. Only one witness, Greenwood, testified upon the subject.

Charles S. Daveis, for plaintiff.
William Pitt Preble, for defendants.

STORY, Circuit Justice, delivered the opinion of the court to the following effect:

The cross bill is founded upon an asserted compromise of settlement of the cause of suit, stated in the original bill, pending the suit; and, of course, if established in point of fact, it puts an end to the whole controversy. It has, accordingly, been first argued by counsel; and we are of opinion, that the compromise and settlement are not sufficiently established by the proofs in the cause to overcome the full and positive denials in the answer, that any such transactions were ever agreed upon by the parties. The known rule in equity is, that an answer, which is responsive to the allegations and charges made in the bill, and contains clear and positive denials thereof, must prevail, unless it is overcome by the testimony of two witnesses to the substantial facts, or at least by one witness, and other attendant circumstances, which supply the want of another witness, and thus destroy the statements of the answer, or demonstrate its incredibility or insufficiency as evidence. There is no pretence to say, that this state of things exists in the present case, and therefore, the cross bill must be dismissed with costs.

The original bill seeks to set aside a contract, made on the 18th of June, 1835, between James Todd, one of the defendants, for himself, and as agent of several of the other defendants, with the plaintiff and several other persons, stated in the bill, for the purchase of ten undivided sixteenth parts of a certain tract of land in the state of Maine, containing about 16,000 acres of land, of which the plaintiff was to have three sixteenth parts, and his copartners certain other proportions, for the sum of $50,000, payable in certain instalments, a part in cash, and a part at future periods, for which the respective purchasers were to give their several notes and mortgages respectively. The bill mainly insists, that the agreement was entered into upon gross and fraudulent representations made to the plaintiff, and the other purchasers, as to the true character of the land, and especially as to the quality of timber thereon; and that, upon the faith of those representations, the purchases were completed, the conveyances taken, and the moneys paid, and securities given by them respectively; and that, therefore, it ought to be set aside and cancelled: and that the plaintiff, who sues for his own separate right

and interest in the premises, he having subsequently become a sub-purchaser of 1-32 more of the tract, and, therefore, being entitled to 7-32 parts thereof, ought to be restored to all he has paid; and the bill prays for other relief. We have said, that the bill mainly proceeds upon the imputation of fraud; but its allegations are sufficient to found a claim for relief, if the bargain was made upon material representations of matters of facts, constituting the basis thereof, which are untrue, even although innocently made by the mistake of the parties. or by the mistake of the sellers alone. Nothing is more clear in equity than the doctrine, that a bargain founded in a mutual mistake of the facts, constituting the very basis or essence of the contract, or founded upon representations of the sellers, material to the bargain, and constituting the essence thereof, although made by innocent mistake, will avoid it. Mistake, as well as fraud, in any representation of a fact, material to the contract, furnishes a sufficient ground to set it aside, and to declare it a nullity. The Reports are full of cases to this effect; and many of them will be found collected in the elementary writers on equity jurisprudence.[2] In the view, which the court are disposed to take of the bill and evidence, we do not deem it at all necessary to enter upon the consideration of the question of fraud, as we are entirely satisfied, that, if there has been no fraud, there has been such a mistake of both parties, as to a fact, not only material, but constituting the very basis of the agreement, as requires the court to decree, that the agreement be rescinded and the conveyance made in pursuance thereof be set aside, and the parties be restored to their original rights and interests, antecedent to the agreement.

Let us, in the first place, examine the written agreement between the parties, taking along with us the fact, that Todd was acting as principal, as to a portion of the land, and as agent of the other owners, as to other parts thereof, which were included in the sale. The agreement is in the following words: "Articles of agreement made this eighteenth day of June, A. D. eighteen hundred and thirty-five, by and between James Todd, of Portland, in the state of Maine, on the one part, and Otis Daniel, Josiah Daniel, Robert W. Mollineaux, E. F. Messenger, Jonathan A. Richards, and James H. Champney, and Barnum Field, all of Boston, in the county of Suffolk, and commonwealth of Massachusetts, and Daniel A. Sigourney, and John F. Soren, of Roxbury, in the county of Norfolk, and state of Massachusetts, on the other part. The said Todd, in consideration of the agreement herein contained of said parties to the second part, hereby agrees with them respectively, to sell and convey to them by good and sufficient deeds, with warranty and a good and indefeasible title, in fee simple, ten undivided sixteenth parts of a tract of land situated in township No. 2, second range, Bingham Kennebec purchase, east of · the Kennebec river, in Somerset county, state of Maine, containing sixteen thousand acres, called the Ford tract, to be conveyed to said parties of the second part, as follows: Three undivided sixteenth parts to said Otis Daniel; two undivided sixteenth parts to said Josiah Daniel; one undivided sixteenth part to said Mollineaux and Messenger; two undivided sixteenth parts to Daniel A. Sigourney and Jonathan A. Richards; one undivided sixteenth part to John F. Soren and James H. Champney; and one undivided sixteenth part to Barnum Field; the said parties to the second part paying for their purchase their respective proportions of the sum of fifty thousand dollars, to be paid as follows: one quarter part in cash, and the remainder, one third in one year; one third in two years; and one third in three years, with interest annually, secured by their respective notes and mortgages on the premises, and the said premises are to be conveyed to said parties of the second part in the proportions above mentioned, at any time on demand within sixteen days from the date of these presents, which time is allowed to said parties of the second part to explore said tract. And the said parties of the second part, in consideration of said Todd's agreement, hereby agree with said Todd to purchase and pay for their respective parts of said tract as before mentioned; and if they do not complete the purchase within the said term of sixteen days, they will respectively forfeit and pay said Todd their respective parts of the sum of three thousand dollars. Provided, nevertheless, that said parties of the second part shall be under no obligation to take said land, or to pay therefor, unless said Ford tract contains sixty millions of pine timber, and a stream runs through said tract, which will, with an ordinary freshet, carry logs from said tract to Kennebec river, without difficulty. In case said tract does not contain sixty millions of pine timber, and such a stream as is mentioned above, said Todd hereby agrees with said parties of the second part, to pay the expense of one person, to be sent from Boston, to examine said tract, and also, whatever may be paid to one other suitable person for exploring said tract for the time he is on the tract. It is understood, that if said parties of the second part, or their agent, notify said Todd of their agreement to take the said premises at any time within sixteen days, they shall be allowed till July. 9th, to make the payments and exchange the papers. In witness whereof, said parties have interchangeably set their hands and seals." (Signed by the parties, and witnessed by S. E. Sewall and Thomas W. Haskins.)

Now, we think it impossible to doubt, upon the reading of this agreement, that it was

---

[2] See 1 Story. Eq. Jur. §§ 140–152, and the cases there cited.

understood by all the parties, that the tract of land did contain sixty millions of pine timber, and that a stream ran through the tract, which would, with an ordinary freshet, carry logs from the tract to the river Kennebec without difficulty; and that these constituted the very basis of the contract, and were so fundamental, that if either did not exist, the bargain was understood not to be obligatory on the purchasers. The proviso, in our judgment, clearly imports this. The subsequent clause, as to the exploration of the tract, was not designed in any manner to waive or control this fundamental stipulation; but merely to afford to the purchasers more complete means of ascertaining the verity of the statements, and thus to secure the purchasers from loss in case of any fraud or substantial mistake. An exploration was accordingly made by an agent of the purchasers, accompanied by an agent of the vendors. How it was conducted, the evidence sufficiently discloses. A more complete example of credulity and delusion on one side, and of mistake and misrepresentation (whether innocent or designed is not material to be examined) on the other side, perhaps, cannot be found in the annals of our country. The survey was not, indeed, even made upon the tract, as it was actually bounded; but, by the mistake or ignorance of the guides, the exploration was in part off of the tract; so that here again there was a fundamental mistake, which made it a new source of error in completing the bargain. The purchasers were further misled by the representations founded on that exploration, as to the nature of the land, and the quantity of the timber thereon, which they had no means of knowing were untrue and grossly exaggerated. The exploration being thus made, in part off of the tract, through mistake or ignorance, so far from strengthening the case for the defendants, furnishes of itself a strong ground of relief for the purchasers. But we do not dwell on this circumstance further than merely to show, that it cannot afford any substantial aid to the defence. It is unnecessary, also, to dwell on the question, whether the evidence shows, that there was any such stream on the tract, as the agreement vouched for, about which there might be some reason for doubt and hesitation. What we desire to place our opinion upon, is the other ground, that the quantity of timber on the tract was grossly mistaken, and extravagantly over estimated. What is the case made out by the entire evidence, with the exception of a single witness? It is, that the pine timber upon the tract does not probably exceed three millions, and at the farthest does not exceed five millions. One witness, indeed, seems to think, that it may contain more, and go to the extent, perhaps, of twenty-five millions. But he stands alone; and his testimony is of small weight, compared with the mass of intelligent witnesses, establishing the more limited quantity.

Here, then, we have a tract, represented by the vendors in their contract as containing sixty millions of timber, and that supposed fact constituting the very basis of the bargain, when, in fact, it does not contain more than one twelfth part of that quantity. A court of equity would be unworthy of the name or character, if a contract, founded in such a gross mistake and fundamental error, were permitted to stand, and were not declared to be utterly invalid. We do not meddle with cases, where the error in quantity is of a slight nature, not going to the essence of the bargain. Here the error is vital. The purchasers have contracted to give fifty thousand dollars for a tract of land, represented to contain sixty millions of pine timber. It cannot be possible, that they ought in law, or in justice, or in common sense, to be bound to pay that amount for five millions only. There is a great deal of other evidence in the cause, as to the representation of the quantity of timber on the tract, made by and through the agent of the owners to the purchasers, as well orally, as by certificates, produced and read in the cause. They confirm the conclusions deducible from the agreement itself; but it does not seem necessary to dwell on them.

These short views exhaust the merits of the case, so far as they belong to the general character of the bill. We are of opinion, that the original contract ought to be set aside, as founded in gross error or mistake; that the conveyance made to the plaintiff, Daniel, ought to be rescinded, and that he ought to be restored to the purchase money, which has been paid by him, deducting whatever he may have repaid out of any proceeds of the sales of timber, cut on the land. Todd, having received the purchase money from Daniel, ought to be held primarily liable to repay it; and in his aid, such of the other defendants, for whom he acted as agent, and such as have received any part thereof, with a full knowledge of all the circumstances, ought to be decreed to repay the proportions thereof respectively received by them.

There is an agreement, found in the case, by which the defendants, who are the vendors, mutually agreed among them, in the division of the notes, taken for the purchase money, that they would, according to their respective interests, bear their respective proportions of any losses, which might arise from the insolvency or inability of the purchasers to pay the same. We have been asked by the plaintiff to give him the benefit of that agreement, in order that he might avail himself of it, in case he is not able, from the parties directly liable to him, to obtain back the purchase money decreed to him by the court. We are of opinion, that he is not entitled to any such aid or relief. That agreement is strictly res inter alios acta, with which he has no manner of connexion, by which he is not bound, and to which he cannot justly, in equity, claim any derivative

title. There are some other circumstances, which may be proper for consideration before the master, under the interlocutory decree, which we propose to pass, for the purpose of carrying into full effect the present opinion. The decree will accordingly be drawn up, and will contain certain declaratory clauses, and institute the proper inquiries necessary for a final decree in the premises.

The decree was afterwards drawn up as follows: This cause came on to be heard at this term upon the bill, answer, exhibits, and proofs produced by the parties, and was argued by counsel, on consideration whereof, it is declared by the court, that the contract of sale, and the conveyance of the premises and the notes of the said Daniel thereupon, as set forth in the bill, were made by and between the said Otis Daniel and the said James Todd, and other parties, upon material misrepresentations and mutual mistakes as to the quantity of timber on the premises so sold, and therefore ought to be set aside, and held null and void; and the said Otis Daniel ought to be repaid the amount of the said purchase money, actually paid by him thereupon and therefor, by the said Todd, who received the notes for the same, and in his aid and for his relief, by such of the other parties, defendants to the bill respectively, for whom the said Todd acted as agent, or who, with a full knowledge of, and assent to, the said contract of sale and misrepresentations and mistakes, have received any of the said notes, or any part of the purchase money paid thereon by the said Daniel; but not for the part thereof received by any other party. And thereupon, in furtherance of the declarations aforesaid, it is further ordered, adjudged, and decreed, that the same contract of sale, and conveyance, and notes be and hereby are annulled, rescinded, and declared utterly void, and of no effect. And the said Otis Daniel is further ordered, adjudged, and decreed to reconvey the premises by such due and reasonable conveyance or conveyances as shall be devised and reported by a master, when and so soon as the purchase money actually paid by him shall be repaid as hereinafter mentioned. And it is further ordered, adjudged, and decreed, by the court, that the said James Todd be, and hereby is, held directly liable to the plaintiff for the whole amount of moneys paid as aforesaid, deducting, however, therefrom the proceeds of timber sold, as well as the value of timber taken from said lands, by and under the authority of the said Otis Daniel, and remaining unsold, and making all due allowances for all proper charges and expenses incurred in regard to said timber, and for taxes paid on the said lands. And it is further ordered, adjudged, and decreed, that such of the other parties, defendants to said bill, as with a full knowledge of the premises, or for whom the said Todd acted as agent, or who assented to the said contract of sale and conveyance, with a full knowledge of the premises, shall be, and hereby are decreed to be liable in aid and relief of the said Todd, to pay and deliver back to the said Otis Daniel, such parts or portions of the purchase money paid by the said Daniel for the said lands, as have been received by them respectively in the premises, or on the notes of the said Daniel so received by them; but no one of them to be liable for any purchase money or notes received by any of the other parties, defendants. And it is further ordered, adjudged, and decreed, by the court, that no damage or interest on the aforesaid moneys be allowed, except the proceeds of such timber, sold and unsold, as aforesaid, shall furnish a fund therefor; and in that event, interest upon said purchase money to be added thereto, as an offset pro tanto to the excess of said proceeds, and not exceeding the amount of such excess. And it is further ordered, adjudged, and decreed by the court, that it be referred to Stephen Longfellow, Esquire, as master, to ascertain the amount due to the plaintiff on the basis of this decree, and also the particular notes and sums received by each of said defendants of said purchase money, so paid and secured as aforesaid, and to report the same to the court. And it is further ordered, adjudged, and decreed, by the court, that the master be clothed with full power and authorities to examine, as well the parties, as any other witnesses, orally or upon written interrogatories, under oath, in the premises, and to require the production of all vouchers, papers, and other documents pertinent and proper in the premises; and that he state a full account in the premises, upon the basis of this decree. And that he be and hereby is clothed with all the usual powers and authorities of a master, in all things touching the premises. And all further orders and decrees are reserved for the consideration of the court.

[NOTE. After the entry of the above decree, and after the cross bill had been dismissed, defendants applied for a rehearing of both the original and cross bill, and also for leave to file a supplemental bill. Both applications were denied. Case No. 3,563.]