## SUPREME COURT—IN EQUITY.

K. KAPAAKEA *et als. vs.* JOSEPH H. MORRISON AND KEOHOHIWA HIS WIFE.

As BETWEEN the seller and buyer, it is not the mere inadequacy of price, unaccompanied by other circumstances, which will avoid the contract in a Court of Equity. But where a party has held a situation of confidence, and has acquired information respecting the value and extent of the subject of the contract, and has not imparted it to his *cestui qui trust,* and uses it to his own advantage, it is sufficient ground for the interference of a Court of Equity; as for example, where the excess of land, over and above the extent represented by the buyer, was so great as to shock the moral sense, the difference being as between 1200 or 1500 acres and 50,000 or 60,000 acres.

Inadequacy of price may be sufficient ground for refusing to enforce specific performance of a contract, when it would not be for setting aside a sale.

ALLEN, C. J.

This is a bill in equity, filed by K. Kapaakea, A. Keohokalole, his wife, and David Kalakaua, to set aside, on the ground of fraud, the conveyance of a tract of land situated in the district of Hamakua, Hawaii, known as the Ahupuaa of Paauhau, made by the complainants to Joseph H. Morrison.

The bill sets forth in substance, that A. Keohokalole was possessed, in her own right, of the Ahupuaa of Paauhau, and that Kapaakea, her husband, was entitled to the usufruct of said land and to a curtesy therein; that Kapaakea and Keohokalole did, on the 17th of September, 1856, convey to their son, David Kalakaua, the said land of Paauhau, together with other

estates, in trust, for the payment of the debts of Kapaakea, and for the benefit of A. Keohokalole ; that, subsequently, David Kalakaua visited the Island of Hawaii for the purpose of ascertaining the extent and value of Paauhau, in order that the same might be disposed of to the best advantage ; that he invited Joseph H. Morrison, the first named respondent, to come from Paauhau and meet him at Hilo, for the purpose of giving him correct information in regard to the land ; that said Morrison is the husband of Keohohiwa, the other respondent, who had previous to her marriage acted as superintendent of the land, and that her husband had exercised the functions of superintendent subsequent to the marriage ; that Kalakaua informed Morrison of his desire to sell Paauhau, and asked him what was the extent of it, to which he replied that it consisted of about twelve hundred acres ; that much of it was occupied by kuleanas, and that the character of the land was poor ; that after much conversation Morrison proposed to purchase the entire Ahupuaa, which he represented as twelve hundred acres, at the rate of half a dollar per acre, or six hundred dollars ; that Kalakaua, believing the representations of Morrison, sold him the land at that price, and on the 11th of November, 1856, executed and delivered the deed, describing the land by its name, which deed was subsequently executed by Kapaakea and Keohokalole, under the like impression as to the extent and value of the land ; that the land being encumbered by a mortgage to James I. Dowsett, an agent of Morrison made like representations to Mr. Dowsett as to the value and extent of the land, to induce him to release his mortgage ; that the representations made by Morrison were untrue and fraudulent in respect of the extent of the land, its quality, and its being much occupied by kuleanas, inasmuch as it contains about fifty thousand acres, is less occupied by kuleanas than is usual for large lands, and much of it being arable and productive ; that instead of being worth only six hundred dollars, it should be valued at about twenty thousand ; that Morrison has transferred a comparatively small portion of the land to John P. Parker for the sum of three thousand dollars, and several smaller portions to certain other parties, for sums unknown to the complainants ; that since the conveyance to him, Morrison has declared to sundry persons

that he did not think he was purchasing so large a tract of land as it now appears is contained within the boundaries of Paauhau, but supposed at the time that he was purchasing only twelve hundred acres or thereabout. The complainants tender back the sum of six hundred dollars, being the consideration expressed in the deed of conveyance to Morrison, praying that said deed may be declared void ; that said Morrison may be required to account for the moneys he may have received for the sale of any portion of the land ; that an injunction may issue and that the respondents may be required to deliver up so much of the land as has not been transferred to *bona fide* purchasers.

The respondents in their answer admit that Keohohiwa has, since her marriage, but not before, acted as the nominal superintendent of Paauhau, but deny that her husband has ever acted in that capacity, although he has at times taken the trouble, gratuitously, to forward to Keohokalole the small sums of money received from time to time from the natives living on the land under the Konohiki. They admit that the respondent Morrison went to Hilo for the purpose of meeting Kalakaua, in accordance with the following note :

"OCTOBER 27th, 1856, Keaiwa, Kau.

SIR :—The mail for Kohala leaving to-day, I embrace the opportunity to write, and wishing you to meet me in Hilo by November and give some information of Paauhau, Ahupuaa in Kohala, my mother and father having appointed me their sole agent for all their property, both real and personal. Therefore if you would be so kind as to meet me in Hilo by November 9th, before my departure for Honolulu, bringing with you the yearly rent or lease of the land, if there is any; however, as much money as you can bring with you. Give my *aloha nui* and regards to Keohohiwa and the family.

I left Keohokalole at Kaawaloa, and since my absence in Kau *nei*, I received a letter from her informing me that Likiliki was very ill, but some expectation of recovering. My health is agreeable, and hoping yours the same,

I remain yours ever,        D. KALAKAUA."

The respondents state that Morrison met Kalakaua at Hilo on the 8th of November, but that up to that meeting Morrison

had no knowledge whatever of Kalakaua's intention to sell the
land ; that at the interview Morrison handed to Kalakaua the
sum of ten dollars, which had been received from native tenants,
informing him at the same time that the income from Paauhau
was very small, as most of the natives there had kuleanas, of
which there were twelve or fourteen on the land ; that Kala-
kaua asked respondent if he knew how much Paauhau contained,
to which he replied that he did not know, and that he had heard
it never had been surveyed ; that Kalakaua then asked the re-
spondent if he knew any person who would purchase Paauhau,
to which he replied that he did not ; that Kalakaua then said
to him, "Don't you want to buy it yourself?" to which respond-
ent replied that he would give another land on Maui in exchange
for Paauhau, but Kalakaua said he could not trade in that way,
as Paauhau was mortgaged, and he wished to raise money to
pay off the mortgage, adding that he would sell the land for the
amount of the mortgage, which he said was about six hundred
dollars ; that respondent, having established a home on Paau-
hau, was willing to purchase it, and then said he would give
that sum for it, to which Kalakaua agreed after some reflection.
The first named respondent positively denies that he stated in
the conversation with Kalakaua, or at any other time, that Pa-
auhau contained twelve hundred acres, or any other definite or
ascertained quantity of land, or that he ever proposed to pur-
chase it at a price per acre, or at all, until asked to do so by
Kalakaua ; or that he was informed of Kalakaua's intention to
sell Paauhau before being asked how much it contained, or that
he misrepresented the extent, value or quality of said land.
The respondent Morrison further avers that the deed of con-
veyance was not executed by Keohokalole or Kapaakea, "at his
request," as he had no communication with either of them in
relation thereto ; that the execution of said deed was not ac-
knowledged by Keohokalole until thirty-nine days after the
sale, nor by Kapaakea, until more than three months after the
sale, showing that they had ample time for inquiry and deliber-
ation before perfecting the conveyance ; that it is not true, as
alleged, that any agent of his, or any person by his authority,
ever represented to James I. Dowsett that the extent of Paau-
hau was twelve hundred acres, or any other definite quantity ;

that, previous to his purchase, he had resided on his wife's ku-leana, on the clear part of Paauhau, lying between the sea and the forest, and that he had no occasion to learn the extent of Paauhau, or how far it extended towards the mountain, or to explore the forest which covers the greater part of it, and that its ancient boundaries are up to this time unknown and unde-fined; that there are thirteen kuleanas, comprising about one hundred and thirty-seven acres, situated on the aforesaid clear part of Paauhau, some of which intersect the land in its entire breadth; that it is not true, as alleged, that any considerable portion of Paauhau is "arable and productive to the agricultur-ist," or can be made so at present, on account of its distance from a market or shipping port; and that the land is poor and poorly watered, yielding for the most part only a coarse, innu-tritious grass, not fit to fatten stock; and that the sum which he paid for the land was its fair market value at the time. Such is the case in substance, as set forth in the bill and answer.

This case has been argued with great care and ability. The testimony has not been especially complicated, and I do not re-gard it necessary to give it very much in detail, but shall con-fine my attention to such portions as bear upon the questions in which are involved the substantial merits of the case.

It is contended by the complainant that he was induced to make the sale by material misrepresentations of the respondent, who it is alleged stood in the capacity of agent, and before making any exposition of the general law of the case, I will in the first place confine my attention to the consideration of this allegation.

It appears from the answer and the evidence that this ahu-puaa called Paauhau had been in charge of the mother of the wife of the respondent for many years, and at her death the superintendence devolved or was conferred upon the wife of the respondent, who acted as konohiki of the land. This kind of agency may be regarded as somewhat peculiar to the Hawai-ian customs. It does not appear that the husband had ever acted any further than in aid of his wife, she being regarded by the owner of the land as the konohiki, and he had not been re-garded as in charge, and I do not think any one should have the responsibilities of an agency unless it is defined and under-

stood. For if a man is acting in a fiduciary capacity, and makes a contract greatly to his advantage, the law would regard it as fraudulent, unless it appeared that both principal and agent equally understood the nature and circumstances of the contract; for the agent must not conceal any facts within his knowledge which might influence his principal as to price or value. The question does not turn upon the point of intention, but upon the obligation, from the fiduciary relation of the parties, to make a frank and full disclosure. (1 Story's Equity Jurisprudence, 344; Farmer *vs.* Brooks, 9 Pick. Rep., 42.)

We are of opinion that this fiduciary relation did not exist between the parties by virtue of the agency of the wife. But it is contended that as the respondent was invited by one of the complainants to visit Hilo to give him information of Paauhau, and to bring the rent of the land then due, and he did visit him in pursuance of said request, that he is still bound to make true statements, and to conceal no information material to a full understanding by the complainants of their rights. This undoubtedly created a relationship of trust to the extent for which the communication was made between them, and renders his duties and obligations of a higher character. For by acquiescing in the request he assumed to act in conformity to it, and he must be held to a full and faithful discharge of his duty in the character and capacity in which he assented to act. He came to bring the rent and to give information, and it is very clear then that he must give the information within his knowledge, and conceal no facts material to the full understanding of the case, especially if any misstatement or concealment should redound to his own great advantage in maturing the contract for the same land, for information of which this interview at Hilo was solicited. What then is the testimony in relation to the negotiation? It appears the parties met at Hilo, and after some conversation about the land, its income, opportunity for its sale, extent, etc., Kalakaua asked respondent if he did not wish to buy it, whereupon a negotiation ensued; a contract was made, in pursuance of which a deed was executed. It is alleged in the bill that the respondent made this very material statement that the tract contained about twelve hundred acres, which is denied in positive terms by the respondent, and as contended

for by him, the general rule of law is, when an answer to a bill makes a distinct denial, the proof of the statement must be sustained by two witnesses, or one witness and corroborative circumstances, which are equally convincing and of equal weight with another witness. It is necessary in this connection carefully to analyze the testimony.

The testimony of Penihassa Wood is, that he was present at the negotiation for the land between the parties; that he was clerk to Kalakaua, and lived in the same house with him at Hilo. That a letter had been sent from Kau by David to Morrison, and that Morrison came to Hilo in pursuance of the request in the letter, and after some conversation, David asked Morrison if he wanted to buy the land. They had some conversation between them in regard to a mortgage, and there was an apparent disagreement in their views. At that time David asked Morrison how large the land was. He said he was not certain in regard to that, but he judged it would be from 1,200 to 1,500 acres, and if David concluded to bargain with him, he thought six hundred dollars was a fair sum for it, it being at the rate of half a dollar an acre. Morrison also stated, at the same time, that the land was not so valuable on account of there being a great many kuleanas in it. Kalakaua asked Morrison if that was a good land for grazing purposes; the answer was, " not very good ; it would do, perhaps, for bullocks." It was mentioned in the conversation that it was not very good for grazing purposes on account of the kuleanas, which made it troublesome. Mr. Morrison made that observation. David asked Morrison if he knew of any body else who wished to purchase that land. Kalakaua asked him if there was any person at Waimea or about there that would be likely to buy the land. Morrison answered that he did not know of any person who wished to purchase it. Cannot say whether this conversation was before or after David's proposition to Morrison to buy. The conversation was all at one time. On the cross-examination he says that the conversation in regard to the number of acres was subsequent to that in regard to the price ; but, subsequently, he says, when he heard David ask Morrison if he wanted to buy the land of Paauhau, I only heard there was a mortgage of $700, and that David offered to sell

the land for the amount of that mortgage. It was in the course of that conversation that the quantity of land was mentioned, but I cannot say which was mentioned first. Morrison offered $600 for it. I cannot say whether the dollars were mentioned first or the acres ; cannot say whether Morrison said anything about the land not having been surveyed, he might have done so, but I don't know. H. A. Kahanu was present the whole time of the conversation. Kahanu says that he went to Hawaii with Kalakaua in 1856, and that they visited Hilo on the same tour, and that he stopped in the same house with him. He states substantially that he heard a conversation between Kalakaua and his clerk in relation to the land, and he remonstrated with Kalakaua for selling the land. " I then remarked to Kalakaua that I had sold a land in Kau, a very poor and rocky land, for $700. Kalakaua said to me, ' This is cheaper, because there is only twelve hundred acres.' I then told Kalakaua, saying, I have heard that the land on this side is all good land ; but on the Kona and Kau side it was all rocky. Mr. Morrison was there and heard the conversation. Then David addressed himself to Mr. Morrison in English, and asked him how many kuleanas there were on that land. Morrison said there were ten or more, and I then endeavored to persuade Kalakaua not to sell, as it would be a loss to him. David then asked Morrison how much land there was remaining not taken up in kuleanas. Morrison said there was from 1,200 to 1,300 acres perhaps. Then David instructed his clerk to prepare the papers to be sent somewhere to Keohokalole."

The testimony of Judge Austin is to the effect that he was present at Mr. Coney's office, where the agreement for a deed was drawn, but he does not remember the conversation. He says : " I understood at that time that the land had been sold for $600 to Morrison, and that Coney was drawing up the agreement for the deed. Did not know anything about the size of the land at that time. Don't think I heard any conversation between Kalakaua and Morrison before or after that time. I said nothing in negotiating the release, except that it was a large land." In the cross-examination he says: " I had several interviews with David when I was negotiating the release in January. Nothing was said at that time about any

definite quantity of land. I don't recollect that acres were ever mentioned by David at any time. Nothing was ever said by David at any time about the land being sold at any price per acre. I gathered from the conversation that he had sold Paauhau." In relation to the release from Mr. Dowsett, he says : " I afterwards saw Dowsett, and after considerable negotiating he consented that if he received $640, or the amount of the mortgage which he had actually taken up, he would release it. David consented that $595 should be paid to Dowsett and $5 which he had received before, and I gave $40 out of my pocket and gave it to Dowsett to secure the title. He said he believed he was doing it blind. I said it was a large land. It is reputed to be a large land. Paauhau was reported to be a large land. I never mentioned in my interview the amount of acres of Paauhau. I never heard it estimated in acres ; but I considered that there were several thousand acres."

The testimony of Kaii is to the effect that he saw Mr. Morrison on his return from Hilo, and in conversation he stated that he had purchased Paauhau for $600, and he thought it a good bargain, for he thought the quantity was between 50,000 and 60,000 acres.

Kahina swears that Wood and Kahanu were present at the time that Morrison was at Kalakaua's.

Mr. Dowsett, who held the mortgage on Paauhau, says at the time he gave a release, the land was treated as being 1,200 or 1,500 acres, and that he gave it the quit claim supposing it to be 1,500 acres.

The testimony of Mr. Low is, that the distance from the sea to the forest is about three miles. He regarded it as a poor tract of land, and that Mr. Parker's purchase embraced four-fifths, and he is of opinion that if Mr. Parker had not lived there, that he could not have found a purchaser for a large price—for a much larger price than Mr. Morrison gave for it. Morrison, on examination, said he had more land than he supposed.

He estimated the quantity at 30,000 acres ; but he says it is almost impossible to judge of quantity, and he would not pretend to give an opinion with any degree of accuracy.

Mr. Coney says, at the time the agreement was made there

was no quantity stated, Mr. Morrison stating that " the land had not been surveyed, and we don't know how many acres there are," but it was understood that the whole of Paauhau was included in the purchase. He testifies that he saw Wood and Kahanu riding about Hilo after Mr. Morrison left his house to go to see Kalakaua ; never saw Kahanu before seeing him at Hilo. There is a conflict of evidence in relation to their presence at the negotiation, but they swear positively they were there.

There was the evidence of Puupuu, who swears that Wood and Kahanu were not present when Morrison and Kalakaua were negotiating, and that he saw Kahanu go into the house while they were there.

This is an illustration to some extent of the difference of weight to be given to positive and negative testimony. The Court have very carefully considered its merits in connection with all the circumstances of the case and will apply to it the principles of law which should govern Courts of Equity.

In a proceeding in Equity to set aside a sale of land for fraud, the person who is most benefitted by the sale is in a situation to be suspected of it, if a fraud is actually committed. If such person makes statements as to material matters connected with the value of the land, and which from being within his own private knowledge, or other circumstances more clearly relied on by the purchaser, and they turn out to be false, the sale is void, whether he believe them to be true or not. (Smith *vs.* Babcock, 2 Wood and Minot's, 246.) These are recognized principles. In this case the respondent made statements in a matter material to the value of the land, to wit, as to its quantity ; and it is clear that its quantity was far more within his private knowledge, for he lived on the land and his wife was its Konohiki, and the daughter of her, who had been so before her, and in addition he was surrounded by people living on the same land, and who must have had a general knowledge of its extent. His residence and these relationships affording such means of a reasonable judgment, would have very naturally impressed any one with a strong conviction of an approximating accuracy of statement.

Hilliard, an eminent writer on the law of venders and pur-

chasers, regards the doctrine as now well established that actual misrepresentation avoids the sale, even though made through the ignorance of the seller himself. In the case of Doggett *vs.* Emerson, 3 Story's Rep., 659, Mr. Justice Story says that a seller is bound to act with the utmost good faith, and if he misleads the purchaser by a false or mistaken statement as to any one essential circumstance, the sale is voidable. I cannot entertain a doubt that the sale was made upon the credit given to the representations made by the purchaser of the quantity and quality of the land. The purchaser lived on the land, and his wife and her mother have had charge of the land for many years, and it seems incredible that they should not have known that it contained a quantity far greater than represented, for his residence was some distance from the sea, which was the boundary, so that there were several hundred acres between him and the sea, and extending many miles to the interior. In the case to which I have referred, Judge Story says that he who misleads the confidence of another by false statements in the substance of a purchase should not profit by it.

It is very clear that there was great inequality in their situation—the one with every means of knowledge from his residence and relationship, and the other, although the owner, still residing in Honolulu, and relying upon the respondent, who was the husband of her who had charge of the land, and whom the complainant addressed in his note to meet him at Hilo, on the subject matter of the land, and desirous of making a sale on account of the mortgage to Mr. Dowsett. Although I do not regard the respondent as acting in a fiduciary capacity, and would not avoid the sale technically on that account, still he was equally bound in honor and good faith to have made a full and fair statement, and one which he knew to be true, or he should have made none. The evidence is that he made the statement that the tract contained twelve or fifteen hundred acres, when on his return from Hilo he stated that he thought he had made a good bargain for $600, believing the quantity fifty or sixty thousand acres, and in July following he writes to Mr. Gaskin that he has become a great landholder of fifty to sixty thousand acres, and the lowest estimate by the respondent's testimony is thirty thousand, and of course it was a mis-state-

ment, and that he must have known that the tract was large—far larger than the representation—the circumstances to which .I have referred already, are most convincing.

It is very clear from the evidence of Mr. Dowsett that the complainant supposed he was selling the quantity of land alleged to be represented by the respondent, and Mr. Dowsett, who was the mortgagee, acted under the same impression. What then was the duty of the respondent when he discovered that there was this extraordinary excess in quantity so much beyond his expectation when he purchased, especially when we take into consideration the mode and manner in which the bargain was made and the relationship in which he stood to the complainant, and especially the circumstances in which he stood to him on that occasion? On the ground that both parties were equally innocent and equally mistaken, the law would set aside the sale. In the case of Evans *vs.* Llewellyn, 2 Bro., C. C., 150, the doctrine is held that a conveyance obtained from persons uninformed of their rights is set aside, though there was no actual fraud or imposition. In this case it is very clear that the complainant was uninformed of his rights, and if there was no proof of misrepresentation, in a bill in Equity, making this the ground of relief, a Court of Equity would set aside the sale, unless the party was clearly and distinctly put on his guard. The most common mistake in sales of real estate relates to the quantity of land conveyed, as compared with the agreement or intent of the parties upon that subject; and I-regard the doctrine to be this, that when a contract has been consummated without any fraud, misrepresentation, or concealment as to the quantity, the Court will not inquire whether there has been a mistake upon that point. (Veiden *vs.* Fondo, 3 Paine, 94.) So when a purchase is made and a deed given for so many acres more or less, and it turns out that there is less by actual survey than the estimated quantity, the buyer will not be relieved. But when a tract of land is sold for a sum in gross, the boundaries control the description of the quantity, neither party can have a remedy against the other for an excess or deficiency, unless it is so great as to furnish evidence of fraud or misrepresentation. (1 Hilliard on Venders and Purchasers.) But in this case the sale of the land was made in gross, without the aid of

boundaries as a basis to calculate quantity, and the excess was so enormous, that without misrepresentation, it would come within the principle that it furnished, *per se*, evidence of fraud or misrepresentation. But if the excess had not been so great as to be beyond all amount contemplated, there could be no relief. This matter of excess beyond what could have reasonably been contemplated depends very much upon the nature of the tract of the land—an excess in a mountain tract, of comparative little value per acre, might be reasonably contemplated, as in this very case, when such a proportional excess would not be in lands fit for the cultivation of sugar. In the case of Vaules *vs.* Craig, 8 Cranch, 371, it appeared that the owner of a land warrant had obtained a survey for 2,000 acres, and he transferred the same for a valuable consideration and assigned the plan and certificate to the purchaser, whereupon he obtained a patent in his own name; and after a re-survey, it appeared that the grant contained 2,700 acres, the vender failed to support a claim in equity for the overplus against the vendee. In the case of Harrigan *vs.* Talbot, 2 Dana, 258, a difference of 33 per cent. between the actual and estimated quantity sold in the gross was held to raise a presumption of such mistake, and give a claim to relief in Chancery. In the sale of a tract of land of the character of Paauhau, extending from the sea to the mountain, a Court of Equity would not interfere, unless the excess was so great in comparison to the consideration received as to shock the moral sense, and to convince any man of sense at the first blush that it furnished evidence of fraud or misrepresentation, or a mistake that should be rectified, with as much reason as when such a sale is made as given in Lord Raymond before referred to. In Belknap *vs.* Paley, 2 Duer, 570, when a party has been induced to purchase land by the unintentional misrepresentations of the seller as to quantity included within the boundaries, the deficiency being material, equity will rescind the contract; and this, though the complainant seeks relief upon the ground that the representations were fraudulently made, if the answer admits a mistake as to quantity. (Secs. 2, 3, Hilliard, vol. 1, 336.)

The quantity here is so disproportionate from what the seller supposed there was, differing from twelve to fifteen hundred

acres to from thirty to fifty thousand acres, and the error is so fundamental that it would be gross injustice to sustain the contract. Were the error in quantity of a slight nature, we should not regard it of sufficient moment to set aside the conveyance, but with the circumstances of this case, neither the principles of law or justice can sustain it. In the case of David *vs.* Mitchell *et als.*, 1 Story Rep., 172, the doctrine is fully sustained that a bargain founded upon material misrepresentations of matters of fact, even though they were inadvertently made through the mutual mistake of the parties, or by the mistake of the grantees alone, will be annulled in equity. Whenever a person has held a situation of confidence, and has acquired information respecting the value of the subject of the contract, and what he has not imparted to his *cestui que trust*, and uses it to his advantage, it is sufficient ground for the interference of equity in cases when if no such confidence had been reposed equitable relief could not be given.

The Court do not hold that, *per se*, this sale is void from the relationship of husband and wife, who is the superintendent of the land, in accordance with a usage somewhat peculiar to this people, but we regard it as an incident in the transaction of some moment, and, like inadequacy of consideration, has material weight with the other circumstances of the case, so that in summing up the whole case it presents this statement : Paauhau was many years ago placed in the charge of the mother of the wife of the respondent, so that she was known and regarded as its konohiki, and after her death this supervision was assumed by the daughter, who continued to exercise it till the sale. The respondent, after his marriage in the year 1852, took up his residence on a kuleana of this tract of land, some distance (two or three miles) from the sea, and has continued to reside there ever since. In October, 1856, Kalakaua addressed a note to respondent requesting him to visit Hilo and give him what information he could in relation to the land, and to bring him what money he could ; he complied with this request, and carried him ten dollars, all the income of the land then collected. What was the respondent's duty at this interview, called as he was to give information ? He should have fulfilled this obligation in the first instance by giving all the information within

his power, and placing Kalakaua in the same situation with himself on the scale of knowledge, and a negotiation could not properly follow for its purchase till this had been done.   He came to Hilo in pursuance of this request, and it was a *suppressio veri* to have concealed any information he had of the land. What had been his means of information ?   His residence on the land, his acquaintance with the country round, his association with those who had known the land for many years, and in whose supervision it was at that time ; how can it be possible that he should not have known that this vast tract which he soon after regarded as fifteen or sixteen miles in extent, and containing fifty or sixty thousand acres, should have been limited to twelve or fifteen hundred acres ?   But admit, for the sake of the argument, that he did labor under this extraordinary error at the time, what was his duty after he discovered the extent of his purchase, so contrary to what he knew was Kalakaua's understanding of the case at the time of sale, as well as that of Dowsett, when he relinquished his mortgage ?   Was it not clearly to have offered a re-conveyance, on the ground of error ; for, after the discovery, it became a fraud to hold on to the bargain under such circumstances ?   This doctrine is laid down in the Court of Chancery in England, in the case of Reynolds *vs.* Sprye, Vol. 13 English Law and Equity Reports, pp. 113, 114, where Lord Cranworth says as follows :

" Where, therefore, in a negotiation between two parties, one of them induces the other to contract on the faith of the representations made to him, any one of which has been untrue and known to the party so to be, the whole contract is in this Court considered as having been obtained fraudulently.   Who can say that the untrue statement may not have been precisely that which turned the scale in the mind of the party to whom it was addressed ?   The case is not at all varied by the circumstance that the untrue representation, or any of the untrue representations, may, in the first instance, have been the result of innocent error.   If, after the error has been discovered, the party who has innocently made the incorrect representation suffers the other party to continue in error, and act on the belief that no error has been made, this, from the time of the discovery, becomes, in the contemplation of this Court, a

fraudulent misrepresentation, even though it was not so orig-
inally.

" These are all principles of such obvious justice as to require
neither argument nor authority to illustrate or enforce them,
and they need but to be stated in order to command immediate
assent. . The only question can be in each particular case, how
far the facts bring it within the principle.

"However negligent the party may have been to whom the
incorrect statement has been made, yet that is a matter afford-
ing no ground of defense to the other. For no man can com-
plain that another has too implicitly relied on the truth of what
he has himself stated."

The authorities regard representations of material facts,
known to be false, or not known, whether they are true or false,
as the same in legal effect ; for the affirmation of what one does
not know to be true is as unjustifiable in law as the affirmation
of what is known to be false, and especially under the circum-
stances in which those statements were made. No man can be
justified in making false and rash statements to complete a con-
tract of great advantage to himself. (1 Story Eq. Jur., 193 ;
Ainslie *vs.* Medlycott, 9 Vol. Pick., 21 ; Pearson *vs.* Morgan, 2
Bro. Ch. R., 389 ; Collins *vs.* Harrison, 12 Met. Rep. 549.) If
misrepresentations are made, when parties are in treaty upon
the subject matter of a sale, and which are the inducement to
complete it, the inference is that they were made for this pur-
pose. There was evidence in relation to the situation and
quality of the land, but the Court have not regarded it material
in the consideration of this case, as the extraordinary difference
in quantity between the amount on which the bargain was
predicated, and the amount in proof, is sufficient ground to
avoid the sale and give relief, when the whole circumstances of
the sale and the principles which govern Courts of Equity are
regarded.

In the case of Cockell *vs.* Taylor, Callet *vs.* Preston, Pres-
ton *vs.* Collett (English Law and Equity Reports, vol. 15, page
101), the Master of the Rolls, in giving judgment, says, " Coup-
ling this inadequacy of price with the other circumstances of
the case, the question I have to determine is, whether this is
a transaction which this Court can allow to stand. It is not

my intention to lay down that any inadequacy of price, un-accompanied by other circumstances, will avoid a contract, unless, perhaps, it be similar to that referred to by Lord Hard-wicke as having occurred in the case of Jones *vs.* Smith (1 Loving, 111, and 1 Keble, 569), and Thornborough *vs.* Whitacre (6 Mod., 305, and 2 Raymond, 1,164) where a man, supposing that he was buying a horse for a few barley corns, had in reality contracted to give 500 quarters of barley for a horse worth £8. It is, in fact, evidence of fraud, but standing alone, by no means conclusive evidence ; and if a purchaser with his eyes open, without concealment or deception on the part of the seller, choose to give ten times the value of a property, it is far from my intention to say anything that can lead to the supposition that this transaction can be impugned." A. B. being desirous of raising money to enable him to prosecute his claim to a fund in Court, applied to a solicitor for that purpose. An agreement was executed, by which the solicitor agreed to lend £1,000, and A. B. agreed to purchase from him some land for £6,000 (ten times its value). The land was conveyed, and the funds in Court mortgaged by A. B. for the £6,000 ; but the £1,000 was not advanced at the time. The Court, on the ground of the gross inadequacy of value, coupled with the other circumstances of the case, set aside the whole transaction with costs.

It has been contended by the learned counsel for the re-spondent that the Court should regard the sound distinction recognized in Courts of Equity between the defense to a bill for specific performance, and that for rescinding the contract. This is a true distinction ; for inadequacy of price may be sufficient ground for refusing to enforce specific performance of a contract, when it would not be for setting aside a sale, and the parties would be left to their legal remedies. (Osgood and Franklin, 2 Johns.; chap. 1, 23.)

In the case of Davidson *vs.* Little (22 Penn., 245) the Chan-cellor refused to interfere where a contract had been executed, by declaring it void on the ground of inadequacy, except in the case of an heir expectant. So in the case of Clitheral *vs.* Ogilvie (1 Desaus, 250), the Court refused to decree specific performance of a sale, when the inadequacy of price was very

Kapaakea *et als. v.* Morrison and Keohohiwa.

great, though there was no direct fraud or imposition, the seller being a young man, just of age, ignorant of the value of the land, and having acted somewhat precipitately on being urged. The authorities unquestionably sustain the doctrine that a Court of Equity may refuse to enforce an agreement for inadequacy of consideration, yet the inadequacy must be so great as to be evidence of some unreasonable advantage, amounting to evidence of fraud. Lord Thurlow says that the bargain must be such that it will be impossible to state it to a man of common sense without producing an exclamation at the inequality of it. In the case of Seyman *vs.* Delancy (3 John Ch. R., 445), the Court maintains the doctrine that the inadequacy must be so great as to shock the moral sense of an indifferent man, if the contract is entered into deliberately and fair in all its parts, otherwise it is no objection to its being executed. From the fluctuation of prices it is very clear that it would be unsound and unfair to set aside a conveyance of property on this ground alone ; there must have been deceit against which ordinary prudence could not protect. In the case of Griffith *vs.* Spratley (1 Cox, 383), Eyre, Chief Baron says that, if Courts of Equity were to unravel all these transactions, they would throw everything into confusion, and set afloat the contracts of mankind.

When a party has been induced to purchase land by the unintentional misrepresentations of the seller as to quantity, the deficiency being material, equity will rescind the contract, and this, though the complainant seeks relief upon the ground that the representations were fraudulently made, if the answer admits a mistake as to the quantity—(Belknap *vs.* Sealey, 2 Dace, 570.) In this case the answer does not admit a mistake although the evidence fully proves that there was a far larger tract even than the respondent supposed he was purchasing.

The general doctrine is admitted on all hands that when the quantity of land is knowingly misrepresented by the vender, the contract is not obligatory on the vendee, though the land be sold in gross, or by certain boundaries. In the case of Smith *vs.* Babcock (2 Woodbury & Minot, 246), it is declared that if a person makes statements as to material matters connected with the value of the land, and which, from being

more within his private knowledge or other circumstances, were clearly relied on in the purchaser, and they turn out to be false, the sale is void, whether he believe them to be true or not. It is not contended that the original design of the respondent was fraudulent, but if afterwards he deviated from his duty, and made misrepresentations, which influenced the negotiations greatly to his own advantage, it would be, in point of law, a breach of trust, involving a constructive fraud, against which a Court of Equity ought to give relief.

It is further contended that the complainant's culpable neglect, in not ascertaining with some degree of accuracy the extent and value of his land, was a bar to a recovery. All courts sustain the doctrine that when the negotiation is fair, and the parties equally innocent, and the quantity is by estimate and not by measurement, that the sale should be confirmed—and this is the principle upon which this case depends.

Was the negotiation a fair one? Were the parties equally innocent?

His wife was the konohiki of the land. According to an Hawaiian custom, she received this agency, her mother having been the agent before her; he lived upon the land; is it not an inevitable inference that he knew that it was a large land, and contained a far greater quantity than 1,500 acres? The lowest estimate is that the tract contains 30,000 acres—and others estimate it at 50,000. With this knowledge, and the relationship which existed between the parties, even if there was no legal agency on the part of the husband, still it imposed upon him a duty to be frank and open in his statements. If the law could regard him as responsible for the agency of the wife, a Court of Equity would regard the transaction as fraudulent *per se,* but we are not prepared under the circumstances of this agency, which is peculiar to the Hawaiians, to impose upon the husband the liabilities which are incurred by the common law, and we do not therefore regard this relationship of itself, not sustained by other evidence, as sufficient to sustain the complaint, and render the contract void.

The answer is full, and direct in its denial of the fraud and misrepresentation, and nothing but the clear and decisive tes-

timony of two witnesses, or by other evidence quite equivalent, ought to outweigh such an answer. The testimony of Wood, and Kahanu, and of Dowsett in corroboration, the circumstance of his residence on the land, and the inevitable inference of an approximate knowledge of quantity, from the fact of his wife having the supervision ; and his knowledge of the country and his letter to Gaskin, all show that his statement was recklessly made, and considering his relationship to the complainant, were calculated to gain his entire confidence.

The Court is aware that the estimate of quantities is always uncertain, and the Court would not regard any considerable amount of difference in this case as evidence of misrepresentation; but, can the human mind believe that a person who lives on an ahupuaa of land of 30, or 50,000 acres, with all the means of information which he had, could make a mistake of this enormous extent. Besides, if he did not know, he should not have made a statement calculated to mislead, and if he did know he should have stated truly ; for nothing is more clear in equity than that a sale based on misrepresentation of what is material to the bargain, must be set aside.

We are therefore of the opinion that the contract of sale, and the conveyance of the premises as set forth in the bill, ought to be set aside, and held null and void ; but as a portion of the land had been sold and conveyed by the respondent to innocent purchasers, previous to the filing of the bill, the Court are of opinion that the respondent pay to the claimant the amount of money he has received from said sales, less the amout he paid to claimants, and re-convey to them the residue of said Paauhau.

The Court have bestowed some especial attention to the subject of the balance of interest and cost, and have to remark that we regard the case of a vender as contra-distinguished in some respect in an application for relief from that of a vendee, and although the complainants were justified in relying upon the representations of the respondent, and for which he is responsible, yet in view of all the circumstances of the case, we are of opinion that interest should not be allowed on either side of the account, and that each party should pay the cost he has incurred. Reference will be made to the master to state the account, and

a decree will be drawn in conformity to the foregoing principles.

A. B. Bates, C. C. Harris and R. G. Davis for complainants.
J. Montgomery and J. W. Austin for respondents.
June 12, 1860.