FOR THE

## COUNTY OF YORK,

## 1851.

PRESENT:

HON. ETHER SHEPLEY, LL. D., CHIEF JUSTICE.
HON. JOHN S. TENNEY, LL. D. } ASSOCIATE
HON. SAMUEL WELLS, } JUSTICES.
HON. JOSEPH HOWARD. }

## PRATT & al. in equity, versus PHILBROOK.

A contract obtained by fraudulent representations cannot be sustained by the fraudulent party to the injury of the party imposed upon.

To avoid a contract for misrepresentation, it must appear — *that* a deception was intended and was practiced; — *that* it was successful, and *that* it operated a damage to the party deceived.

Though a party may have been deceived by fraudulent representations, it is not usual for courts to interfere in his behalf, if he had full means of ascertaining the truth and detecting the fraud, and yet neglected to do so.

A contract made for the sale and purchase of property, though founded upon the misrepresentations of the seller, cannot be wholly rescinded, for the reason of such misrepresentations, if, prior to the completion of the sale, the purchaser had become acquainted with the whole facts, and yet confirmed the bargain.

VOL. XXXIII.                3

BILL IN EQUITY to set aside the conveyance of certain property, made by the plaintiffs to the defendant, in consideration of his conveyance to them of certain parcels of lumber and rights connected therewith, then on its way by sea to California, and for further relief.

The material facts, upon which the bill purports to be founded, are alleged to be, in substance, as follows : —

The defendant owned eighty thousand of shingles, part of a cargo of lumber on board the ship Hampton. The contract between the master and some shippers of lumber on board, secured to the latter the right to ship lumber, including the shingles, and gave sixty running lay-days, free from demurrage, in which they might take the lumber from the ship after her arrival at the port of destination ; with the stipulation, however, that the freight should be paid as fast as the lumber was delivered, and that, if the freight was not paid within forty-five days from the arrival, the master might sell enough of the lumber to pay the same. Though this contract embraced the shingles, the defendant's name did not appear in it as a party.

Deshon & Co. of Boston owned one half the lumber constituting the cargo of a bark, called " the Chief," then on her way to California. The defendant held a contract by which they agreed to sell to him one-sixth of that cargo, and by the same contract, the defendant agreed to pay them therefor thirty-six hundred dollars, as soon as they should receive the account of sales of said cargo ; — it being the understanding that, if the net avails of said sixth of the cargo should exceed $3600, the surplus was to be paid by Deshon & Co. to the defendant ; and if said avails should fall short of $3600, the defendant was to pay to them the deficiency.

The foregoing were all the rights of any importance, pertaining to the defendant in relation to either of said cargoes of lumber.

To induce the plaintiffs to convey to the defendant the property, which, by this bill, they now seek to reclaim, he represented to them, *that* the master and owners of the ship had, by a contract with the shippers, relinquished their lien upon

Pratt *v.* Philbrook.

the cargo for freight, and agreed to receive the freight at New England, in a given time after receiving news of the ship's arrival at California; *that* said master and owners had bound the ship to wait sixty days after such arrival, within which time the shippers might take their lumber without charge for demurrage; and *that* the shingles came within said contract, and could not be landed nor in any way disposed of within the sixty days, but by authority of the owners of the same.

And in furtherance of the same design, the defendant, in relation to the sixth part of the cargo on board the bark, represented to the plaintiffs that the same belonged to him, and that he had full right to convey the same, free from any charge for freight.

And in connection with said representations, the defendant, in writing, on the 19th of January, 1850, proposed to the plaintiffs that, in exchange for a certain hotel with its lot and furniture, owned by them, he would transfer to them the shingles and the sixth of the bark's cargo, stipulating that he would pay the freight on the one-sixth of the bark's cargo, and on the shingles in the Hampton.

This proposal was upon condition that it should be accepted in eight days from its date.

The plaintiffs had no knowledge of the property thus offered to them, nor of the defendant's title or rights therein, except what they had so received from him. But relying upon the supposed fulness, accuracy and truth of his representations, they forwarded to him a written acceptation of the proposal.

After such acceptance of the proposal, and before the expiration of the eight days, one of the plaintiffs requested the defendant to show him the contract between the shippers and the master and owners of the Hampton. To this request, the defendant replied that he could not show it, for it was in the hands of a man at Augusta. He however reiterated the representations previously made, and to remove all fears from the plaintiffs' mind, stated that, for any inaccuracy

of statements, he was abundantly able to make redress ; that, besides his real estates at Augusta, he was owner of fifty thousand feet of boards on board the Hampton.

The conveyances were executed by the respective parties to each other on the 28th of January, agreeably to the proposal.

The plaintiffs were influenced to their conveyance by the defendant's declaration as to his titles to the lumber, and the rights connected therewith and as to his ownership of said boards.

After the exchange conveyances had been prepared, the schedule of the cargo on board the bark being before the parties, the plaintiffs noticed that among the charges was included an item of $325 for insurance, and they claimed to have the benefit of the policies. The defendant replied that no part of them had been assigned to him, and that he supposed Deshon & Co., in case the bark should be lost, would expect to retain the insurance money to pay what he owed them. And thereupon they received from the defendant, the conveyance in a new draft, relative to the sixth part of the cargo of the bark, by which the defendant conveyed the same to them, to be delivered, (freight paid by the defendant,) to the plaintiffs or their authorized agent, on the arrival of the bark at her place of unlading in California, but to be sold with the rest of the cargo by the consignee already appointed by the shippers, and the proceeds, deducting his commissions and charges, to be paid to the plaintiffs or their agent at California, it being agreed that the defendant was to pay Deshon & Co. $3600, according to his contract with them, and to secure to the plaintiffs all the benefits which he might have had from the insurance on the one-sixth of said cargo.

On the 2d of February, and a few days after the exchange-conveyances had been made, the plaintiffs received a letter from Deshon & Co., stating that the defendant had no legal title to the sixth part of the cargo of the bark, and no right to make an absolute sale of it, but offering, as a substitute for the existing agreement, to make a conveyance of the sixth part to

the defendant on his paying the $3600. The defendant thereupon gave to the plaintiffs an assignment of his contract with Deshon & Co., with whom the plaintiffs arranged that Deshon & Co., on receiving from the defendant the $3600, should give to the plaintiffs the benefit of one-sixth part of the policies. The plaintiffs thereupon, by advice of the defendant, procured insurance upon the profits of the sixth of said cargo, to the amount of $5000, at an expense of $177, — and upon the shingles at an expense of $120.

To secure a right disposal of the property at California, the plaintiffs, immediately after the acceptance of the defendant's proposal and before the conveyances were exchanged, dispatched an agent to that place with full power to act for them in the premises.

The $3600 were never paid by the defendant to Deshon & Co.

The bill charges that the defendant in truth had no boards in the Hampton, and alleges that on the 10th June, 1850, the defendant informed the plaintiffs that he never owned the boards in the Hampton, but "held them only for some fellows on board."

The Hampton arrived at California about the 5th of March, 1850, and on some day prior to the 18th of April, the master sold the shingles to pay their freight.

The plaintiffs' agent, having arrived at California, immediately inquired for the Hampton, and found that the master had, within the sixty days, discharged the cargo, and gone upon another voyage. He found the bark, and demanded, for his principals, from the master and consignee, the sixth part of her cargo, as conveyed by the defendant. But neither of them recognized such an ownership, and they refused to yield to the demand.

In the plaintiffs' efforts to secure the benefits of their trade, they incurred large expenses.

On the 9th July, 1850, they offered the defendant to return to him the conveyances received from him, and all other papers in relation to the shingles and sixth of the bark's cargo,

and to release any supposed rights the plaintiffs had thereto, and demanded a reconveyance of the hotel, its lot and furniture, and that the defendant should pay to them their reasonable expenses and damages; all of which the defendant refused to do. And the plaintiffs say they are and will be ready to deliver to him said bills of sale, papers and release, whenever he will comply with said demand, and pay them reasonable damages, expenditures and rents, and their costs in these proceedings.

This bill is founded upon the frauds, misrepresentations or mistakes of the defendant, as above mentioned, by means of which the plaintiffs allege that they were induced to make the exchanges and to incur the expenses.

The prayer of the bill is, that said exchange-conveyances may be set aside, and that the defendant be decreed to pay damages and expenses, and that such further relief be extended to the plaintiffs as equity requires.

A general demurrer was filed and joined.

*Leland* and *J. Shepley*, in support of the demurrer.

*Eastman* and *W. P. Fessenden, contra.*

TENNEY, J. — By this suit, the plaintiffs seek to rescind the contract by which conveyance of the " Thornton House" and the lots of land connected therewith in Saco, and furniture in the house, was made to the defendant, in consideration of the sale of certain lumber on the way to California for a market, and interests therein; and also for damages alleged to have been sustained by the plaintiffs. The ground on which relief is prayed, is that the plaintiffs were induced to part with their property by reason of misrepresentations made fraudulently, or by mistake, in reference to the lumber, which was supposed by the plaintiffs to be transferred to them.

A contract obtained by fraudulent representations cannot be upheld to the injury of the one imposed upon. But to take advantage of fraud in a contract, it must be shown that the other party intended a deception and was successful therein, to the damage of the party defrauded. 2 Stark. Ev. 467.

A bargain founded in a mutual mistake of the real facts,

constituting the very basis or essence of the contract, or founded upon misrepresentations of the seller, material to the bargain, and constituting the essence of it, will avoid it. *Daniel* v. *Mitchell & al.* 1 Story, 172.

But it is equally clear, that contracts, by which a man has understandingly parted with his property, where he was not the victim of deception at all, although fraudulent representations were actually made by the other party, will not be held nugatory ; nor will they be so, if the fraud really perpetrated has deceived the one, who has transferred his property, if the deception has had no effect to cause damage. And if a party is imposed upon by the fraud of the other, where the former had the full means of detecting the fraud and ascertaining the truth, and neglected to inform himself of it, when he might easily have done so, courts have not interposed in behalf of the injured party. And it has been held, that if a seller of property was not in possession at the time of a sale thereof, no action will lie against him, though it be not his own, without express warranty, for there is room to question his title. 2 Stark. Ev. 471, 472 ; *Medina* v. *Stoughton,* 1 Salk. 210 ; *Morley* v. *Attenborough,* 3 Welsby, Harlstone & Gordon, 499.

The defendant is alleged in the bill to have made certain representations in reference to a quantity of shingles laden on board the ship " Hampton," and to a part of a cargo on board the bark " Chief," both on their way to California, and supposed to be near their ports of destination, of which property, the plaintiffs took bills of sale from the defendant, containing covenants of warranty, in exchange for the property conveyed by them, including the deed of the " Thornton House" and land connected with it, with like covenants.

The bill states, that the defendant represented to the plaintiffs, that there was a contract between the several owners of the cargo, on board the " Hampton," and the owners and master of that ship, in and by which the latter relinquished their lien upon said cargo, for freight of the same, and bound themselves to receive such freight of the former in Maine or Massachusetts, a certain number of days or months after news of

the ship's arrival should have reached them; and by which contract they bound the master to wait at such place of unlading with said ship, and cargo on board, sixty days after such arrival, for the several owners of the cargo, their agents or consignees, to appear and take delivery thereof, free from any charge of demurrage, and that the shingles were under that contract, and could not be landed, nor in any way disposed of before that time.

The bill further states, that at the time the parties met to make their instruments for the exchange of the property,-- which had previously been agreed, the plaintiff Emery asked the defendant to show him the contract between the several owners of the cargo of the " Hampton," and the master and owners of that ship, and the defendant replied, that the contract was in the hands of Judge Redington. And upon the request of Emery that the time, in which the bargain was to be finally closed by the agreement, should be extended so as to enable him to see the contract, the defendant declined, but reaffirmed, that his previous statements and representations were true, and further said, that besides all his property at Augusta, he had fifty thousand feet of boards in the ship, besides the shingles. Whereupon Emery remarked, if there is any mistake as to the freight of what you propose to convey to us, or as to the title, you will have ample means to set the matter right in California, as soon as the vessels arrive, to which said Philbrook made no objection and was understood to assent.

The defendant is alleged in the bill to have said further to the plaintiff Emery, that he owned one-sixth part of the cargo of the bark " Chief," which portion he had purchased of one of the owners thereof, free from any charge of freight.

By the contract referred to, touching the shingles, the master and owners of the ship " Hampton," agreed to deliver them to such person and at such accessible point on the bay of San Francisco, as the shippers may direct, allowing to the shippers sixty lay-days at said point, the freight money to be paid as

fast as the lumber is delivered, the master having the right to hold the same as security for the freight. If within forty-five days from the arrival and notice to the consignee, the freight be not settled, the master is authorized to sell the lumber, enough to pay his freight, having due regard (in the place, time and mode of sale) to the best interest of the shippers. And the bill states, that on June 10, 1850, the defendant informed Emery, that he never owned the boards represented by him previously to be fifty thousand, laden on board the "Hampton," and that he "held them only for some fellows on board."

The interest of the defendant in the cargo on board the bark "Chief," was under a contract with Deshon & Co., by which the latter agree to sell to him one-sixth part of that cargo, and to deliver the same from the bark's tackles at such port as the said bark shall sell her cargo at on the North-West coast, or wherever she shall deliver her cargo for the owners. And the defendant in consideration of the agreement of Deshon & Co., agreed to pay the sum of $3600 for said sixth part of the cargo, as soon as the account of sales were rendered to said Deshon & Co., who were to have the control of the funds, and after taking out expenses of getting the funds home, and when they became due to them, they were to pay to the defendant, the balance due him ; and if it amounted to less than $3600, he was to pay the deficiency.

It is averred by the plaintiffs, that they were ignorant of the contents of the contracts in relation to the shingles and the sixth part of the cargo of the bark ; also of the title to the fifty thousand of boards represented to belong to the defendant in the "Hampton," until long after the conveyance of the Thornton House, the land and the furniture, and in that conveyance, they were induced solely by the representations of the defendant as contained in the premises in the bill.

It is very manifest, that the statements alleged to have been made by the defendant as the inducement to make the exchange of property, were materially different from the truth as exhibited by written documents, and the statement afterwards

made by him. But if the bill shows, that before the execution and exchange of the instruments of transfer, the plaintiffs or either of them were in any manner informed of the want of truth in the defendant's representations, they cannot be the ground for a rescindment of the whole bargain. Or if, afterwards, a knowledge of the true state of the facts was possessed by them, and they affirmed the previous bargain unconditionally, it must be treated in the same manner as though it was originally made under the same state of knowledge. Facts known to the plaintiffs when they affirmed the contract, if such was done, cannot of themselves be a reason for a rescission thereof.

The contract under which the shingles were to be carried in the " Hampton" was expressly referred to as being in the hands of a former party thereto, residing in Augusta ; it does not appear, that the plaintiffs were informed where this contract was till it was too late to send for it, and complete the bargain within the time, during which the defendant was to be bound ; but in his written offer, dated Jan. 19, 1850, it is stated, that " I am to pay the freight on one-sixth of the cargo in the Chief and on the shingles in the Hampton." This was entirely unnecessary, if there was to be no lien in favor of the master and owners of the vessel for the freight of the shingles, and has the appearance of a personal engagement, that the defendant would see that the lien, which might exist, should not interfere with the title to be given to the plaintiffs.

It is stated in the bill, that immediately after the acceptance in writing of the defendant's written offer to exchange and the terms of the same, and before the transfers were made, the plaintiffs dispatched their agent to California, for the express purpose that he might be there in season, and as their agent, to take possession of the shingles and the sixth part of the cargo of the " Chief." At what time the agent arrived there does not appear. But the first act attempted under his agency is represented to have been on April 25, 1850.

About the 5th day of March, 1850, the ship Hampton arrived at California, and within sixty days, the shingles were sold

for freight ; and on April 17, 1850, one Bodfish wrote to the defendant informing him thereof.   The time of this sale is not specified, but it must have been within forty-five days after the arrival of the shingles, according to the dates mentioned in the bill, which was the earliest time, they could be sold for the freight under the contract.

At the time the sale was made, the defendant was in nowise responsible therefor.   It was a manifest violation of the contract made by the master and owners of the ship, as it really was.   If the plaintiffs had fully known all its provisions, at the time the defendant's offer to them was accepted, there is no allegation, that this sale could have been defeated.   It is nowhere stated, that full knowledge of the contract would have enabled the plaintiffs to have sent their agent in season to California with funds to have paid the freight and prevented the sale.   It is stated that no time was lost after the parties had agreed to make the transfer, before the agent departed for California, and on inquiry for the Hampton, after his arrival, he was informed that she had discharged her cargo, and had proceeded upon another voyage.   The bill does not show, that any injury has accrued to the plaintiffs, from any concealment or misstatement of the contents of the contract, so far as it respects the time, when the master and owners of the ship was authorized to sell the shingles for the payment of the freight.

It is stated, that Emery was mainly influenced to make the exchange of property, without further investigation, by the declaration of the defendant, that he had fifty thousand feet of boards in the ship " Hampton ;" but it is not averred, that if he had known fully the contents of the contract in reference to the shingles, he would not have executed the contract to exchange property.   Have the plaintiffs been injured by the representations respecting the boards ?   They were not sold to the plaintiffs either absolutely or conditionally ; no contract having been made concerning them, none has failed of fulfilment.   That there were that quantity of boards in the Hampton, held by the defendant, is not denied.   In what man-

ner they were held for others docs not appear. They may have been entirely subject to the control of the defendant, with authority to appropriate the proceeds at pleasure; and therefore to indemnify the plaintiffs on account of the lien upon the shingles for the freight from their avails. It is not stated in the bill, in what mode the boards were to be made available in California, nor how they were to be disposed of. They may have long remained unsold after their arrival. It does not appear, that the plaintiffs' agent had advices from them on the subject, or that any measures were taken to secure them or their value, if sold, for the benefit of the plaintiffs. They may have been sold, as were the shingles, for the payment of their own freight. And if done as early as the sale of the shingles, it has not been shown that there was any opportunity for the defendant's consignee to have received notice of any appropriation thereof being made for the plaintiffs' benefit, before they were disposed of. It cannot be inferred, that any misrepresentations in this respect have resulted in an injury to the plaintiffs.

When the contract between the defendant and Deshon & Co. is examined in all its parts, it cannot be contended that the former was the absolute owner of one-sixth part of the cargo of the bark " Chief."

After the parties had prepared their instruments to carry out their bargain to make the exchange of property, the schedule of the property on board the " Chief," being before them, and the plaintiff Emery being reminded by the item of insurance, that he ought to have the benefit of the insurance so far as it applied to the portion of the cargo, which was about to be sold to him, and it also occurring to him, that it was important for him, that he was secured in a fair and equal sale of the part of the cargo, in which he was to be interested, with other portions, another contract was made and executed, by which it was agreed by Emery, that the sixth part of the cargo was to be delivered, freight paid by the defendant, to Emery or his authorized agent, on the arrival of said bark at her place of unlading in California, but to be sold with the rest of the cargo

by the consignee, already appointed by the shippers, and the proceeds, deducting his commissions and charges, to be paid to Emery or his agent in California ; it being agreed that the defendant was to pay Deshon & Co. $3600, according to his contract with them.

At this time, which was before the exchange of the property, Emery must have been advised, that there was a claim upon the sixth part of the cargo, in favor of Deshon & Co. If the title was absolute, or so believed by Emery, in the defendant, it was unnecessary that there should be a stipulation, that the payment of the consideration should be made by the defendant. There is the appearance, that Emery had suspicions at least of the facts as they actually existed, and was careful, that there should be an express agreement, which would render the defendant personally liable, that any incumbrance upon the property should be removed.

But on Feb. 2, 1850, Emery was fully informed by a letter from Deshon & Co. of the condition of the property and the claims thereon. Immediately after, Emery complained to the defendant of his misstatements, and at the call of Emery, the contract with Deshon & Co. was placed in his hands, and a new arrangement was thereupon made. The contract of Deshon & Co. was assigned to Emery, and the defendant agreed to pay the sum of $3600. Nothing was then said by Emery in reference to the original bargain of exchange, being invalid on account of fraud or mistake. It is clear, that Emery chose not to forego the opportunity of making profit from the transaction. He preferred to rely upon the personal obligation of the defendant to relieve the property of the claim of Deshon & Co., to an entire rescission of the whole bargain, and a reconveyance of the real estate and the furniture in the house.

By this new arrangement and the assignment of the contract of Deshon & Co., the former agreement must be regarded as ratified, and the parties to stand as they would have done, had this new agreement been part of the contract, under which the exchanges were made. No condition was annexed to the

contract ; and the failure of the defendant to fulfil his prom-
ises or his covenants to pay money, cannot of itself be suffi-
cient to authorize rescission of the conveyance made by the
plaintiffs. Whatever took place in California, beyond what
was contemplated by the plaintiffs and the defendant, was not
by the procurement of the latter. If the master of the
" Chief" or the person to whom the cargo was consigned in
California, improperly declined to permit the agent of the
plaintiff to take possession of a sixth part of the cargo, no
blame therefor can attach to the defendant. If it was in con-
sequence of the failure of the defendant to pay the claim of
Deshon & Co. ; it was the violation of a personal undertaking
and cannot be a sufficient ground for rescinding the contract
for fraud or mistake.

The bill must be deemed insufficient upon demurrer, and
must be dismissed without costs for the defendant.