CASE No. 831.

## MITCHELL v. PINCKNEY.

1. In sales of land, particularly by public officers, a warranty cannot be implied; and, therefore, to an action for the purchase money, the defence of failure of consideration growing out of a breach of the contract, cannot be sustained. *Cases cited.*
2. But where there is a misrepresentation as to quantity which misleads a purchaser exercising proper diligence, he is entitled, in an action for the purchase money, to an abatement for the value of the deficiency.
3. Where, however, the purchaser, after his bid, becomes informed of the deficiency, and then complies with the terms of sale by giving his bond and mortgage and accepting title deeds, he thereby waives such defect.
4. Having taken possession, the expenditure meanwhile of large sums upon the property, and a notification to the officer who made the sale that an abatement would be claimed on account of the deficiency, does not affect the waiver.

Before HUDSON, J., Charleston, March, 1879.

Nothing need be added to the statement of the case contained in the opinion of the court, except the Circuit decree, which is as follows:

This cause was heard upon the pleadings and the testimony taken before the referee.

The action is for the foreclosure of a mortgage, given for the purchase money of certain lots of land, with machinery, buildings and structure thereon, known as the Tyler Cotton Press. The defence is a partial failure of consideration.

It appears that on March 19th, A. D. 1874, under certain proceedings had in this court, in a cause entitled Gibbes *v.* Gourdin and others, several lots of land, with machinery, buildings and structures thereon, known as the Tyler Cotton Press, exhibited upon a plat, were sold at public auction in the city of Charleston, R. Q. Pinckney, a defendant herein, became the purchaser, and went immediately into possession of the property. There was some question whether this was with the consent of the parties. But it does not affect the case.

Before complying with the terms of sale, which were part cash and a part credit, he placed the muniments of title in the hands of his attorneys for examination.

During the examination it was discovered by the attorneys employed by him that the title of one of the lots, supposed to be a part of the Tyler Cotton Press, was in a third person.

This discovery was communicated to the defendant Pinckney, but was made known to no one of the parties in the suit or their attorneys, who, it is clear from the testimony, knew nothing of it. Notwithstanding this discovery, Pinckney, under the advice of his counsel, complied with the terms of sale, paid in the cash portion of the purchase money, and executed the bonds and mortgage to the full amount of his bid. These are the bonds and mortgage now in suit. The next day he gave notice of the deficiency.

It is the law of this state, that a purchaser, even at public sale for partition, by an officer of the court, may protect himself from any deficiency in the quantity or defect in the title of land, as well as personalty sold, in an action for the recovery of a bond or note for the purchase money. He can avail himself of this defence, if he purchased innocently, without notice of this defect.

As matters of fact, I find in this case that Pinckney had a general knowledge of the Tyler Cotton Press property before the sale, and of the purpose for which it was intended and used. That the plat referred to in the advertisement of sale, and which was a part of the title, in itself contained enough to put him upon the inquiry. That he completed purchase with full knowledge of the alleged defect in the title, after full notice thereof, and notwithstanding such notice, and that he cannot avail himself of such defect in this suit. It is ordered, &c.

From this decree defendant appealed.

*Mr. G. R. Walker,* for appellant.

The equitable rule is in favor of the purchaser; " that although he can not have a partial interest forced upon him, yet if he entered into the contract in ignorance of the vendor's incapacity to give him the whole, and chooses afterwards to take as much as he can get," he has a right " to insist on that with compensa-

tion for the defect." *Adams' Eq.* \*91, and cases cited in note. This doctrine is the law in this state. 1 *Bay* 276; 2 *Id.* 11, 558; 1 *McC.* 121; 1 *N. & McC.* 78; 2 *Id.* 76; 9 *Rich.* 515; 9 *S. C.* 287; 17 *Ves.* 395; *Harp.* 441. Misrepresentation, when coupled with failure of consideration, is even stronger ground for such recoupment. 1 *Bay* 277; 2 *Bay* 17; 4 *Reporter* 238, 271.

The purchaser having gone into possession in March, having begun repairs, and incurred heavy obligations prior to the discovery of the misrepresentation and deficiency, he could only comply with the terms of sale and ask recoupment. *Kerr on F. & M.* 338–9.

And courts of equity certainly will relieve from the effects of misrepresentation. *Id.* 53–4; 1 *N. & McC.* 81; *Waterman on Set-off* 570, 571; *Rice* 325; 1 *McC.* 121. And such misrepresentation, though unintentional, is, nevertheless, a fraud perpetrated upon the purchaser. *Kerr on F. & M.* 53–4, 56–68. But the plaintiff knew that she had already sold lot No. 1. The doctrine of *caveat emptor* does not apply to judicial sales where there is mistake, fraud or failure. In partition proceedings the sheriff is the agent of the parties. Cases above cited. See, too, 10 *S. C.* 164. And the facts clearly show that there has been no waiver by the defendant.

*Mr. H. E. Young,* contra.

There was no deficiency in the quantity of the land sold. Defendant and his partners bought the Tyler Cotton Press and have got it. 2 *Mills' Const. R.* 100; *Harp.* 290; 1 *Rich.* 491; 2 *Id.* 485; 2 *Strob.* 374; 3 *Id.* 127; *Rice's Eq.* 55; 1 *Rich. Eq.* 427; 2 *Johns.* 37; 6 *Binn.* 102. If there was deficiency, defendant is entitled to no abatement of price, as the contract was executed with full knowledge of the deficiency. *Story's Eq. Jur.,* § 202; 2 *Kent* 473; 4 *Id.* 554; *Sudg. on V. & P.* 399, 403, 506, 680, 685; 4 *N. H.* 397; 4 *Wall.* 232; 2 *Wheat.* 15; 9 *Id.* 616; 1 *Bay* 276; 2 *Bay* 11; 1 *McC.* 121; 2 *Spears* 9; 2 *Strob. Eq.* 154; 1 *Rich. Eq.* 409; 6 *Rich.* 361; 9 *Id.* 516. Taking possession, as Pinckney did, was a waiver of all objections to the title. *Sudg. on V. & P.* 168, 398, 506, 682; *L. R.,* 9 *Eq.* 51;

2 *Exch.* 783; 1 *Jac. & W.* 221; *McC. Ch.* 405; *McM. Eq.* 59; 4 *Desaus.* 134; 3 *Strob. Eq.* 171; 1 *Rich. Eq.* 407; 4 *Rich.* 114; 9 *S. C.* 35.

*Messrs. C. H. Simonton* and *W. H. Brawley,* on same side.

*Mr. J. B. Campbell,* in reply.

March 15th, 1880. The opinion of the court was delivered by McGowan, A. J. A. R. Mitchell, Robert Mure, S. Gourdin and James S. Gibbes, as A. R. Mitchell & Co., were the owners of the property in the city of Charleston known as " *The Tyler Cotton Press,*" which consisted of the cotton press proper and several small lots adjacent. All the parties died except J. S. Gibbes, who, as survivor, in order to partition the property, instituted proceedings against the heirs and representatives of his deceased partners, entitled *James S. Gibbes* v. *Anna J. Gourdin and others.*

In this case an order was made for the sale of the partnership property, including the cotton press and the lots attached to it. On March 19th, 1874, the referee in the case, A. M. Huger, for the sheriff, C. C. Bowen, had the premises sold at public auction, upon the terms of one-fourth cash and the remainder in three equal annual installments. The sale was made under published advertisement, prepared by the referee " from the best sources in his possession," which was read at the sale, and which, so far as this property is concerned, is as follows: "All that lot, piece or parcel of land, known as the Tyler Cotton Press, with the buildings, tenements, hereditaments, machinery, steam engines, fixtures, presses and appurtenances thereunto belonging, situate, lying and being on East Bay street, Longitude lane and Church street, in the city of Charleston, which said lot of land is made up of several lots of land, and is generally described as follows: Butting and bounding to the east partly on East Bay street, and partly on land belonging to Godard Bailey; to the south, on lands now or late of estate Heilbron and estate Kirkpatrick; to the north, onLongitude lane, on land formerly of Miss Copdeville, and on land formerly of Godard Bailey; and west, on

Church street, and land formerly of estate of Miss Copdeville, measuring and containing on the east line, seventy feet eight inches, on the south line, four hundred and forty-one feet eleven inches, west, on Church street twenty-five feet, on the north line on lot of Miss Copdeville, one hundred and twenty-seven feet eleven inches, then north to Longitude lane, one hundred and forty-six feet six inches, then south twenty-five feet, then easterly again, two hundred and thirty-nine feet three inches; all of which is particularly and accurately described in a plat of five lots situated in Ward 1, belonging to the Tyler Steam Cotton Press Company, made by R. Q. Pinckney in June, 1853, and recorded in Plat Book A No. 1, page 89." ·

At the sale, the appellant, R. Q. Pinckney,* for himself and others, including James S. Gibbes, the plaintiff, bid off the property, and he now makes defence, insisting on an abatement of the purchase money to the extent of the value of one of the lots connected with the cotton press, and known as *lot No.* 1, which, he alleges, was embraced in the sale, but as to which the consideration has failed. It is not easy to make the facts clear, as the plat cannot accompany this judgment, but we will endeavor to make them intelligible. The plat referred to was exhibited. It represented the cotton press proper, which was a well-known property, and adjacent thereto other small lots marked Nos. 1 and 2. The lots marked Nos. 3, 4 and 5, as we understand it, were parts of the cotton press proper. The lot No. 1, about which this controversy has arisen, lies in the southeast corner of the premises covered by the plat, is shaded blue, all the other parcels being yellow, and in reference to it, the plat has on its face this memorandum: "Note—Since the above survey was made, the parties interested in the purchase of the lots Nos. 1 and 2 have consented to make the south side of the passage the north boundary of the lot No. 1, which is now *shaded blue.* Done this day of June 28th, 1853, and signed R. Q. Pinckney."

Immediately after the sale, the appellant employed his attorney to look into the titles, and, pending the examination,

---

* The surveyor and the purchaser bear the same name, but are different persons.—Reporter.

took possession of the press and received the proceeds of its business. After controversy, as to who should make the title and several orders on the subject, finally the sheriff executed a deed of the premises, usual in such cases, without warranty, but describing the property in the terms of the advertisement, and left it in the hands of the referee as an escrow, pending the delay incident to the examination of titles. April 14th, the attorney of appellant wrote to the referee, saying: "Our clients have instructed us to pay over to you the first installments of the purchase money on receiving proper deeds of conveyance." A few days after—certainly not later than May 1st—the attorney of appellant discovered that lot No. 1, at the time of the sale, was not the property of the vendors, but, some time before the filing of the proceedings in partition of James S. Gibbes, had been sold to another, whose tenant was in possession. Correspondence was afterwards had as to who should make the title, but no reference was made to the alleged deficiency until June 3d, when notice of it was given to the sheriff by letter, left at his office, which he did not receive until the next day, and possession of lot No. 1, or abatement for its value demanded, which was declined. The next day, *June 4th*, the appellant, through his attorney—without saying anything about the deficiency—paid to the referee the cash installment with interest from the day of sale and executed for the whole credit portion of the purchase money, four bonds, amounting in the aggregate to $9750, and "mortgage of the premises to secure the same, in compliance with the terms of sale." *June 5th*, he demanded from the referee possession of lot No. 1, "as we have complied with our part of the terms of sale," and notified him in writing not to assign bonds or distribute the cash which he had paid him the day before. Under this notice, the referee refused to deliver title deed, which had been retained to make endorsements, and offered to return money, bonds and mortgage. Appellant made some application to Judge Graham (it is not before us) to compel the referee to deliver title deed and for abatement, which was dismissed without prejudice, and does not further affect the case. The notice which the appellant had given to the referee not to pay out was "annulled without prejudice," and demand for title deed to the

"Tyler Cotton Press" renewed, which was delivered to him July 2d. The four bonds executed to C. C. Bowen, sheriff, were divided among the parties in interest. One of them was assigned to Miss Anna R. Mitchell, as executrix of A. R. Mitchell, deceased, and upon that she instituted these proceedings to foreclose the mortgage. The appellant, in his answer, renews his claim for "an abatement as a recoupment on the face of the bonds," to the extent of the value of lot No. 1. The Circuit judge refused to allow the defence, and decreed a foreclosure for the whole amount of the unpaid purchase money, and from that decree the appeal comes to this court.

Some of our cases have gone very far in allowing such defences. The grounds upon which they have been placed are not always clear, and sometimes apparently inconsistent. But the view which underlies them all seems to be this: That an action for the price of property is in some sort a proceeding to enforce a contract, and the equitable principle applies of refusing aid to enforce it except in such way as to do justice between the parties. It may be that this tendency has been increased by a desire to prevent multiplicity of suits, and by not always keeping in view the difference between real and personal property. But by whatever cause produced, we are satisfied that these discrepancies are more apparent than real, and that *the rulings*, as distinguished from the *dicta* of the cases, can be vindicated upon well-settled principles. The law requires that all contracts concerning the transfer of land shall be in writing. A purchaser must protect himself by covenants. It follows that where there is no express warranty none can be implied. Omission to warrant disproves intention to warrant, and if that could be contradicted by *implication* it would be not only creating a contract against the intention but proving it by parol. As to land, there can be no such thing as failure of consideration growing out of a breach of contract, or, as it is sometimes expressed, the equitable condition of sale; otherwise there would be, so far as that defence is concerned, no difference between a *quit claim* and a warranty. We are of opinion that the proper principle is, that in cases without warranty the purchaser, when sued for the purchase money, may set up any defence which is independent of

O

contract and constitutes a demand against the vendor in the nature of a cross-action, such as *fraud or misrepresentation,* and that this is the extent to which such defence can go. All the cases can be harmonized upon this principle. A careful examination of them as to real estate in which abatement has been allowed, will show either that there was warranty, or, if no warranty, that there was *fraud or misrepresentation.* We will not encumber this opinion by citing and commenting upon the cases separately, but adopt the statement of Judge Evans in the case of *Evans v.* Dendy : " It is now more than half a century since the case of Gray *v.* Handkinson was decided, and during all that time I do not find a case where the mere failure of consideration without warranty has been set up by way of defence or any action brought to recover back the money—a circumstance from which it may be fairly inferred that it has never been supposed such defence could be made or such action maintained." *Means* v. *Brickell,* 2 *Hill* 657 ; *Evans* v. *Dendy,* 2 *Spears* 10 ; *Rogers* v. *Horn,* 6 *Rich.* 361.

These principles apply with increased force to sales made by public officers. In sheriff's sales under execution, the rule of *caveat emptor* is absolute, and that is the general doctrine as to judicial sales made under order of court. It is true that in such sales in this state the officer of the court is, in some sense, the agent of the parties, and, while the absolute rule of *caveat emptor* may not apply as in forced sales, yet it is well settled that in judicial sales of real estate there is no implied warranty. *Commissioner* v. *Thompson,* 4 *McC.* 434 ; *Rorer on Jud. Sales* 177, where the authorities are collected. The rule is not so well established where the sale is of personal property, as to which we have adopted the civil law doctrine, "that sound price demands sound property," both in respect to condition and title. The following cases, sometimes relied on to establish the principle of mere failure of consideration as a defence, are in relation to personal property. *Com'r of Roads* v. *Macon & Foot,* 2 *Brev.* 105 ; *Eastland* v. *Longshorn,* 1 *N. & McC.* 194 ; *Com'r* v. *Smith,* 9 *Rich.* 520 ; *Parker* v. *Partlow,* 12 *Rich.* 679 ; *Trimmier* v. *Thomson,* 10 *S. C.* 189.

Was there in this case *such fraud or misrepresentation* as will

constitute a good defence? All the cases agree that the proof of such misrepresentations, whether they are fraudulent or unintentional, must " *be full, clear and explicit,* that they were calculated to influence the party in concluding the contract, and that he acted upon them without examining for himself and exercising his own judgment. The indiscriminate application of the principle without the most satisfactory evidence, would have a tendency to set afloat and derange all contracts." Nothing was said at the sale about title. It is not claimed that there were any misrepresentations unless they were made by the advertisement and plat referred to. These contained no statement as to number of acres, and did not, in express terms, affirm that lot No. 1 then belonged to the parties selling, but the advertisement described the outline by metes and bounds, giving the *east line at seventy feet and eight inches,* and referred to the plat in these words: " All of which is particularly and accurately described in a plat of five lots, situated in Ward 1, *belonging to the Tyler Steam Cotton Press Company.*" It is not perfectly clear that lot No. 1 was represented as included in the property offered for sale as the cotton press, but it was on the old plat referred to as one of the five mentioned, and the respondent might have so understood it. The mistake was produced by the old plat, still representing lot No. 1, after it had been sold, and to that extent may be regarded as an unintentional misrepresentation.

Did the appellant rely upon that statement in the advertisement, and was he misled and induced by it to make the purchase? The property was to be sold under order of the court. Lot No. 1 was divided from the other property, and was in possession of another. It was marked out by being shaded blue, and was specially referred to by a note on the face of the plat. Under these circumstances it is difficult to resist the impression that the appellant did not exercise ordinary diligence in obtaining the information which the facts suggested and which was at hand— especially as Gibbes, who was to have an interest in the purchase, and who must have known all about the property, was present. But the appellant swears positively that he was ignorant of the facts; that he relied exclusively upon the advertisement, and was deceived by it into the purchase of the property.

"The Tyler Cotton Press" was the property advertised, and, doubtless, was the principal inducement to the purchase.; but if it were represented that *lot No.* 1 was a part of it, when it was not, we cannot say that the appellant got the property he purchased. He did purchase the cotton press, and he got it; but he purchased it as it was described; and although he might have done so with or without that lot, yet we think it cannot be regarded as nothing more than a part of the description of "the cotton press."

Assuming that there was a mistake in the advertisement, and that the appellant was in ignorance of it at the time he bid off the property, and that he used proper diligence in informing himself, is he now entitled to have an abatement for the value of that lot? We think not. While it may be that he was ignorant at the time of the sale, it is admitted that he had full knowledge of the alleged deficiency *on June 4th,* when he voluntarily closed the purchase by paying the cash installment and executing bonds and mortgage for the credit portion of the purchase and taking titles. Up to that time the purchase was incomplete. The court confirms judicial sales, and in doing so exercises large powers in correcting errors. Reasonable time is always given for the examination of titles, and, if necessary, a reference will be ordered. From the day of sale up to the day on which he gave his bonds and mortgage and accepted title, the appellant might have refused to comply with his bid, and, if misrepresentation could have been shown, the court would not have decreed against him specific performance.

It seems that he was not willing to relinquish his purchase even after all the facts were known. He said nothing about the deficiency until he complied with the terms of sale and demanded title on June 4th, which was the same, in effect, as if he had bid off the property that day with a full knowledge of the deficiency. He chose to stand to his bargain, indeed insisted upon it, after he had full knowledge, and he cannot be heard to impeach his own bonds, in whole or in part, or to say that he is damaged by misrepresentations when he knew the truth of the matter so represented. "If a vendee becomes acquainted with the fraud before completing his bargain and chooses to go on, a court of

equity will not help him." *Adams' Eq.* 177, citing *Pratt* v. *Phil-brook,* 33 *Me.* 17 ; *Knuckolls* v. *Lea,* 10 *Humph.* 577 ; *Scott* v. *Gamble,* 1 *Stockt.* 218 ; *Whitworth* v. *Stuckey,* 1 *Rich. Eq.* 409 ; *Murrell* v. *Murrell,* 2 *Strob. Eq.* 154 ; *Maner* v. *Washington,* 3 *Strob. Eq.* 171 ; *Story's Eq.,* § 202. Chancellor Caldwell, as the organ of the court in Maner *v.* Washington, says : "Where neither payment has been made of the purchase money by the one party, nor possession given by the other, a defect in the title of the land bargained and sold has always been held a good ground to resist the specific performance of the contract or to entitle the purchaser to an abatement of the price *pro tanto,* or to a rescission of the contract. The warranty of a deed conveying the land would often be an insufficient indemnity for the purchase money if the vendee complied with his contract, and was afterwards compelled to give possession to an outstanding paramount title. But if a party, notwithstanding his being informed of the defect, should persist in the completion of his contract, pay the purchase money, accept a deed and take possession of the land, he will be left to his legal remedy on the covenants of his deed, and equity will not relieve him. Even in executory contracts, a purchaser may do acts that amount to a waiver of his right to raise objections to the title, and may be compelled to take such title as the vendor can make without inquiry as to its validity."

But it is urged for the appellant that the compliance with the terms of sale after knowledge, should not operate as a waiver in this case, for the reason that while he was ignorant he had gone into possession and made such expenditures in repairs, that it was too late to recede without a sacrifice ; that his condition then left him no other alternative but to carry out the purchase. There is no force in this. It was premature in him to take possession before the title was examined. He knew that in doing so he took the risk, for, in his answer, he says, that he took possession "having full confidence in the integrity of the parties." Taking possession itself, under certain circumstances, amounts to a waiver of the defence here made, and, if so, that could hardly destroy the effect of closing the bargain. One incautious act cannot justify another. *Sug. on V. & P.* 398, lays it down that "a

purchaser, by entering into possession, is generally held by that act to have waived the objections to title." The appellant only took possession of the cotton press proper. The lots were not sold separately, but as an entirety—" all that lot, piece or parcel," &c. It is said that he did not take possession under his bid, but by the agreement of the parties. That does not seem to be the proof. Some of the parties were minors, and no one had the right to make any such arrangement for the others. No such waiver was made by any of them.

But it is still further urged for the appellant that at the time he closed the agreement, or rather the day before, *he gave notice to the sheriff* of the deficiency, and of his determination to insist upon the abatement. Notice cannot alter the case. The waiver does not rest upon the intention of purchaser, as to whether he will or will not make the defence, or whether such intention is known or unknown, but upon the single fact of doing the act with knowledge. It is not suggested that the appellant expressly waived or intended to waive any right which he might suppose that he possessed, for the exact contrary is true; but the waiver was the effect of executing bonds, according to the contract, against any defence to these same bonds, upon grounds then known to him.

Giving the bonds for the whole amount was inconsistent with paying them only in part. *Ex parte* notice of such intention could not make a new contract. The only contract was the old one, and the appellant could not close it, according to its terms, either with mental reservation or public notice that he intended to pay only according to the facts as he knew them to exist at the time.

The Circuit decree is affirmed and the appeal dismissed.

WILLARD, C. J., and McIVER, A. J., concurred.