# Ball *v.* Farley, Spear & Co.

### *Assumpsit for Money had and Received.*

1. *Partnership ; money paid by new partner for interest in business.*—When a person buys a half interest in an existing business, under an agreement for a partnership between him and the proprietor, the money paid by him does not belong to the partnership, but to the former proprietor; and the new partner can not complain of its application to the payment of existing debts.

2. *Agency ; failure to disclose facts, as fraud.*—Where plaintiff, desiring to form a partnership with a merchant in business, applied to the brother-in-law of the latter to bring them together for the purpose of negotiating, and with which request the brother-in-law complied, this does not constitute an agency between him and the brother-in-law, nor impose on the latter the duty of disclosing the fact and amount of an indebtedness to him by the merchant; and this debt being secured by a mortgage on the merchant's stock, which was unrecorded, and which was afterwards paid with the money received from plaintiff, the failure to disclose the existence of the mortgage, if fraudulent, would not be actionable, since it could not have injured plaintiff, who was informed of the debt by the merchant himself.

3. *Statute of frauds ; representations as to solvency or credit of third person.*—A verbal representation or declaration, made to a person who desires to enter into business as partner with a merchant, " that he is doing a good business," is not actionable (Code, § 2123), though known to be untrue.

4. *Evidence of intent.*—The uncommunicated motive or intent with which a party did certain acts, or refrained from making inquiries, is not a matter as to which he can be permitted to testify.

5. *Error without injury in charges given or refused.*—When the evidence set out in the record would have justified a general charge in favor of the defendant, any error in other charges against the plaintiff could have worked no injury, and are no cause of reversal.

APPEAL from the Circuit Court of Montgomery.

Tried before the Hon. JAMES E. COBB.

The opinion states all the material facts.

W. L. BRAGG, and WATTS & SON, for appellant.

SAYRE & GRAVES, and H. C. SEMPLE & SON, *contra.*

STONE, C. J.—The copartnership between B. L. Wyman and Charles P. Ball was formed and took effect February 1, 1881. Before, and up to that time Wyman was a merchant, engaged in the hardware business. They entered into a written agreement of partnership, containing the following, among other provisions :

"The said parties have agreed, and by these presents do agree to associate themselves as partners for the purpose of carrying on a general hardware business in the aforesaid city and State (Montgomery, Alabama), upon the following terms and conditions: . . First: The said Charles P. Ball of the second part, covenants and agrees to pay to said B. L. Wyman of the first part, nine thousand dollars, the receipt of which is hereby acknowledged before the sealing and delivery of these presents; in consideration of which payment the said B. L. Wyman of the first part, sells and conveys to said Charles P. Ball of the second part, one-half interest in all stock on hand and to all notes and open accounts, horses and drays, office furniture and fixtures, and generally all and everything in any manner pertaining to, and used in conducting the aforesaid business, prior to the date of this agreement. . . . . . Eleventh: At the expiration of the aforesaid term (five years), or an earlier dissolution of the partnership, the stock and all other assets, or their proceeds, after paying the debts of the firm, shall be equally divided between the said B. L. Wyman and Charles P. Ball, parties to this agreement."

The other provisions of the agreement of partnership relate to details, and do not vary or affect the purpose or scope of the contract. Wyman's interest in the merchandise, effects, and business was valued at eighteen thousand dollars. Ball paid him nine thousand dollars for a half interest, and thereby became partner and equal owner with him of all that pertained to the store.

Who became owner of the nine thousand dollars paid in by Ball? Evidently Wyman, for it was the agreed price and consideration for which half the business had changed ownership from him to Ball. It became Wyman's individual money, to deal with as he chose. Ball had no interest in it, and could not question its appropriation. To test this, let us suppose Wyman had previously had an equal partner, and Ball, instead of buying a half interest from Wyman, had bought out his partner. Would any one contend the money paid by Ball in such purchase would become the property of the firm? Another view: The half interest purchased by Ball was valued and purchased at the agreed price of nine thousand dollars. All the witnesses who speak of it agree in this, and the agreement of copartnership proves it. If when Ball paid the nine thousand dollars, that money became the property of the firm, then, being the owner of half the firm's effects, half the sum—four thousand five hundred dollars—revested immediately in him, or rather, never passed out of him. The result will be,

19

that instead of paying nine thousand dollars for the half interest, he will have paid only four thousand five hundred dollars for it.

If it be claimed that the nine thousand dollars paid in by Ball was his share of the capital stock contributed, and that it became part of the partnership effects, this necessarily leads to the conclusion that Ball's nine thousand dollars was put in as the equivalent of Wyman's entire interest in the mercantile establishment, and consequently fixes the value of that interest at nine thousand dollars, the sum of Ball's payment. All the testimony, as we have shown, proves that Wyman's interest was valued, not at nine, but at eighteen thousand dollars.

Let us look at this question in another aspect. The agreement of partnership contains no express stipulation that the new firm should, with the assets, assume the liabilities resting on Wyman in his mercantile capacity. If no such liability was assumed, then it can make no manner of difference what amount of debts he may have owed. Such debts could neither increase nor diminish Ball's interest or liability. But suppose the partnership did, by the terms of its organization, assume the mercantile debts of B. L. Wyman. Then it becomes necessary to inquire whether the debt to Farley, Spear & Co., was a personal, individual, outside debt of Wyman, or whether it was a debt resting on the mercantile establishment. If the former, then Wyman only paid his individual debt with his individual means, and it can not possibly affect Ball's interest. If the claim of Farley, Spear & Co., was a debt of the mercantile establishment, and, as such, had become the debt of the new firm by virtue of the partnership, then Wyman, with his individual means, paid nine thousand dollars of the firm's liability, and thus, without any consideration, lifted a burden of four thousand five hundred dollars from Ball's shoulders.

We have indulged in the foregoing reflections, for the purpose of showing that in no conceivable point of view could Ball have any interest in knowing what disposition Wyman intended to make, or did make of the nine thousand dollars Ball paid him. Hence, if the latter had no information of Wyman's debt to Farley, Spear & Co., no blame can attach to Farley for not giving him the information. He did know there was a debt, for Wyman informed him of it, and informed him further that with the money he, Ball, was to pay, the debt to Farley, Spear & Co. was to be paid.—*Pratt v. Philbrock*, 33 Me. 17; *Irving v. Kirkpatrick*, 3 Eng. Law.

& Eq. 17, 37 ; *Vernol v. Vernol,* 63 N. Y. 45. Ball inquired of neither of them how much the debt was.

It is claimed for appellant that Farley became his agent in negotiating the purchase from Wyman, and betrayed his trust in not informing him of the extent of Wyman's indebtedness to his bank. All of Farley's agency was rendered in obedience to requests from Ball, and consisted simply in bringing the parties together that they might negotiate. There is neither fact nor circumstance tending to show that Farley knew the value of the assets in the store, or that he knew the amount of Wyman's debts, save what he owed him—seven thousand four hundred and fifty-three dollars at the time of the negotiation. He was neither consulted nor gave advice in regard to the making of the contract, nor its terms, and is not shown to have had anything to do in the matter, save what is stated hereafter. There was no proof of Farley's agency for Ball in making the contract, to authorize its submission to the jury.

In reply to an inquiry by Ball, Farley stated to him, according to Ball's testimony, that "Mr. Wyman is a man of honesty and integrity, and is doing a good business, and is a man of good business qualifications, with one exception ; and that is, he needs a little more push in his business." Ball had previously expressed his belief in Wyman's integrity, from long personal acquaintance. Farley's representation was made orally.

It is contended for appellant that Farley participated with Wyman in perpetrating a fraud on Ball, in inducing him to enter into the contract ; and that the evidence offered tending to prove such fraudulent participation, was enough to authorize the submission of its sufficiency to the jury. This is the pivotal point in this case. The testimony relied on to support this contention is, first : Farley's failure to inform Ball of the extent of Wyman's indebtedness to him, when the negotiation for the purchase was pending. Second, that Farley had a mortgage on the merchandise, and failed to inform Ball of it. Third, the oral representations made by Farley, set out above.

The first ground urged we have considered above, and need give it no further attention.

Second. At the time the trade was negotiated—January 1, 1881—Farley held a mortgage on Wyman's merchandise, which was never recorded. It is not pretended that Farley ever asserted any claim to the property under his mortgage, or that either Ball or Wyman was ever molested in consequence thereof. When the payment of nine thousand dollars was made by Wyman to Farley, or before that time,

the mortgage was surrendered by the latter to the former. It is thus shown that that mortgage never did injure Ball, and by no possibility could it have done so. Not being recorded, and Ball purchasing in ignorance of its existence, his title would prevail over Farley's, in any controversy that might arise in regard to it. Even fraud without injury gives no right of action.—*Jordan v. Pickett*, 78 Ala. 331 ; *Kelly v. McGrath*, 70 Ala. 75.

This question is then narrowed to the third ground stated.

There are decisions of this court, resting in sound morality, which hold that "it is as much a fraud at law to affirm as true what is untrue, though not known to be so, as to assert what is known to be untrue. The law imposes the duty of ascertaining the truth of the statement before making it, and demands in case of omission that the representation shall be made good."—*Munroe v. Pritchett*, 16 Ala. 785 ; *Jordan v. Pickett*, 78 Ala. 331. The principle is, that one, in negotiating a trade, shall not recklessly, or even innocently, assert as fact that which is untrue, if such asserted fact be to any extent an inducement to the other party to enter into the contract. And an honest belief in the truth of such statement of fact, while it exculpates from moral fault, does not relieve from the legal liability to make it good. This principle, however, applies only to *parties*, contracting personally, or through their authorized agents. The rule we are considering was declared in *St. John v. Hendrickson*, 81 Ind. 350, which was a suit between the parties to the contract, founded on the false representation of one of the contracting parties. It would seem that was a case of base fraud.

Farley was no party to the contract, but a mere outsider. What he said, taking the version most favorable to appellant, was only a representation of Wyman's character, trade, dealings, integrity. The only expression he uttered, of which complaint is made, or which is alleged to be untrue, was that he, Wyman, was doing a good business. He did not speak of his solvency, or of the value of his goods. Our statute, following Lord TENTERDEN's act, enacts that "No action can be maintained to charge any person, by reason of any representation or assurance made concerning the character, conduct, ability, trade, or dealings of any other person, when such action is brought by the person to whom such representation or assurance was made, unless the same is in writing signed by the party sought to be charged." Code of 1876, § 2123.

It will be remembered that we have narrowed this case to

[Ball v. Farley, Spear & Co.]

the single inquiry of Farley's representations copied above. We hold that this question is brought directly within both the letter and spirit of the statute ; and the representation not being in writing, signed by the party sought to be charged, no liability rests on Farley in conseqence thereof. *Haslock v. Fergusson,* 7 Adolp. & El. 86 ; *Swann v. Phillips,* 8 *ib.* 457 ; *Hunter v. Randal,* 62 Me. 423 ; *Kimball v. Comstock,* 14 Gray, 508 ; *Mann v. Blanchard,* 2 Allen, 386.

The case of *Warren v. Barker & Co.,* 2 Duvall, 155, is not opposed to the principles stated above, but really supports them. That case is meagerly reported, but enough is shown to give a correct understanding of the principle it declares. Barker & Co. had introduced a man to Warren, who offered a bill of exchange for sale, which was apparently indorsed to the offerer. Warren purchased the bill, and it turned out to be a forgery. The decision of the court, and the language in which it is expressed, force the conclusion that there was an entire absence of proof of combination or collusion between Barker & Co. and the man introduced. The report contains only the opinion of the court, and the following is the summation of the facts as therein shown : "The appellant (Warren) sued the appellees (Barker & Co.) for a false and fraudulent introduction to him, as an exchange banker, of an impostor, holding, as apparent indorsee, a forged bill offered for sale, and which, on the faith of that recommendation, he was induced to buy." The trial court sustained a demurrer to the petition. An amendment was then offered and allowed, charging a fraudulent combination between Barker & Co. and the seller of the bill. The trial "court peremptorily instructed the jury to find for the appellees (Barker & Co.), which they accordingly did."

In pronouncing on the demurrer to the petition as first framed, the primary court "seemed to be of the opinion that, according to the first section of chapter 22 of Stanton's Revised Statutes, page 264, even a fradulent representation, without written evidence of it, would not be actionable." The Kentucky statute referred to is not materially different from ours copied above ; and both are conceived in the spirit which dictated Lord TENTERDEN's act. The court decided there was no testimony of a fraudulent combination. We say this, because the Supreme Court held that the trial court did not err in giving to the jury the peremptory charge to find for the defendants. If there had been any testimony of fact or circumstance tending to show such combination, it would have been plaintiff's clear right to have that testimony weighed by the jury ; for in law courts, the judge

[Ball v. Farley, Spear & Co.]

does not pronounce on the weight or sufficiency of testimony. The language of the court was, "that the testimony would not have authorized a verdict against the appellees on a charge of a fraudulent combination, and therefore (the court could not) decide that the peremptory instruction was erroneously prejudicial to the appellant."

In passing on the sufficiency of the petition as first framed, and, incidentally, on the actionable quality of false representations made by a stranger to the contract, the Kentucky court employed the following language: "Nor will a majority decide that there was error in sustaining the demurrer to the original petition, charging, or attempting to charge a fraudulent misrepresentation. A false representation may not be fraudulent in intent; for, although it may be constructively, it is not actually fraudulent to affirm, absolutely as true, that which the asserter believes to be true. The *malus animus* is the essential and distinctive element of actual fraud.

"Had the original petition intended to charge only a false representation, the appellees would not be suable for it. Our statute, like the Tenterden act of England, should be construed as embracing every false representation untinged by a fraudulent intent; but it does not constructively include any case of actual fraud in wantonly misrepresenting a man's credit or identity, more than any other kind of fraud in fact. Written evidence is not, therefore, required by our statutes, if the petition be sufficient to charge actual fraud. A majority of the court (Judge ROBERTSON not concurring) are of the opinion that the original petition does not sufficiently allege such facts as are necessary to constitute actual fraud; and that, consequently, there was no error in sustaining the demurrer to it." The judgment was affirmed.

The extent of Judge ROBERTSON's dissent should be noted. He did not dissent from the conclusion that the trial court did not err in giving the peremptory charge, and, hence, did not dissent from the court's finding that there was no evidence to go to the jury, tending to show fraudulent combination, or actual fraud. He did not dissent from the proposition that a mere false representation is within the statute of frauds, and not suable unless evidenced in writing. The original petition had averred, as the court's opinion shows, that Barker & Co. had falsely and fraudulently introduced the impostor to the plaintiff. It contained no averment of the *scienter*, or of any intent save what may be inferred from the words, falsely and fraudulently. The majority of the court held the petition insufficient, and from this, and this only, Judge ROBERTSON dissented. We submit if the intro-

duction for business purposes, of an impostor, a forger, or utterer of forged paper, is not a much graver offense against social obligation, than the representation that a merchant "is doing a good business," even though it should be found the representation is untrue.

The offers to prove by Ball, on his re-examination, why he did not make certain examinations into the state of the business, and why he did not make certain inquiries, were, each and all of them, wholly immaterial, under the view we have taken of the case. There is, however, another and conclusive reason why the court did not err in rejecting the answers offered by the witness. They were, at most, but the uncommunicated motive or intent with which Ball did certain acts, and failed to make certain inquiries and investigations. Such testimony is inadmissible under all our rulings.—*Whiznant v. State*, 71 Ala. 383; *Ford v. State, ib.* 385; *McCormick v. Joseph*, 77 Ala. 236; *Stewart v. State*, 78 Ala. 436.

There is no testimony tending to fix a legal liability on Farley, and if the jury had been charged, without hypothesis, to find for the defendant, the charge would have been free from error. We need not, therefore, examine any of the charges given or refused, for no matter what the ruling, it could not injure the appellant.

Affirmed.

SOMERVILLE, J., not sitting.